[No. A035782. First Dist., Div. Three. Sept. 30, 1988.]

In re the Marriage of FLORENCE ADAM and JAMES ABLE GRAY.
JAMES ABLE GRAY, Appellant, v.
FLORENCE ADAM GRAY, Respondent.

## COUNSEL

Norman G. Rosen and Vogel & Rosen for Appellant.

Lee S. Adams for Respondent.

## OPINION

**BARRY-DEAL, J.**—James A. Gray (Husband) appeals from an order granting the motion of Florence Adam Gray (Wife) to quash the summons and dismiss the proceedings in Husband's California action for dissolution of the marital status filed in Mendocino County. The California court granted Wife's motion on the grounds that Husband had failed to comply with the orders of the Superior Court for the District of Columbia (hereafter referred to as the D.C. court) in Wife's action for separate maintenance in that jurisdiction and that the D.C. court was the proper forum for Husband's petition for dissolution of the marriage. We reverse the judgment.

### I. *Factual and Procedural Background*

Husband spent approximately 20 years in the United States Army. After a distinguished career, he retired from active duty in 1960. He and Wife were married in Bergamo, Italy, on October 31, 1974. Thereafter, the couple established residency in Washington, D.C. They separated in November 1982 and have lived apart since that time.

Wife filed a complaint for legal separation and maintenance in February 1983 in the D.C. court. At that time, she was 54 and Husband was 73. She alleged that there were no children of the marriage, but that by a previous marriage she had an 11-year-old son for whom she was the sole support. She requested support, attorney fees and costs, an equitable division of personal property, and an award to her of the marital residence on Chevy Chase Parkway in Washington, D.C. On March 15, 1983, Husband filed an

answer, admitting the jurisdictional allegations of Wife's complaint; he also counterclaimed for an absolute divorce. In her reply to the counterclaim, Wife admitted that there was no hope or possibility of a reconciliation, but opposed a divorce without stating a reason.[1]

On May 10, 1983, the D.C. court ordered that Husband pay to Wife $900 a month for temporary support and that he pay the monthly mortgage payment, alleged by Husband to be $1,248, commencing on June 1. Husband and his counsel were apparently present in court, and the order was based on the consent of the parties and Husband's financial statement showing a gross income of $2,453, which included $2,008 from his military pension, $55 from securities, and $390 from social security.

On May 10, over Husband's objection, the court also issued a temporary restraining order (TRO), ordering Husband immediately to wire his banks and/or brokerage houses outside the country and order them to transmit immediately all bank accounts and other securities to a bank within the District of Columbia to an account in Husband's name to be held until further disposition by the court. It further ordered that Husband was to make no investments without the joint written consent of the parties. A hearing on the preliminary injunction requested in Wife's motion for temporary orders was set for May 20.

On May 20, 1983, Wife filed a petition for writ of *ne exeat* (order to prevent person from leaving country while action pending). In that petition, Wife alleged that Husband failed to comply with the TRO of May 10, that he testified in court on May 10 that he intends to live in Europe and has no income in this country, that he admitted in court that he told Wife if she did not accept his settlement offer he would leave the country, that he testified in court that he would not be traveling abroad until June, and that she was told by Trans World Air Lines over the telephone that Husband had a reservation to leave the country on May 20 with no return date. Based on these allegations, she requested the court to order Husband to surrender his passport and remain within the D.C. jurisdiction until his Swiss assets had been transferred to that jurisdiction, or, in the alternative, that he be required to post bond of $200,000 to assure his compliance with the May 10, 1983, order.

---

[1] In her complaint, Wife alleged that the parties own the marital residence, with title in both names, to which she has made "substantial contributions, monetary and otherwise . . . ." She further alleged that the parties "own substantial personal property located in the District of Columbia and elsewhere. . . ." Her declaration of May 10, 1983, for temporary orders, however, alleged that she turned personal funds over to Husband to invest, and he continues to control those assets. Husband, in his answer, denied substantial monetary contributions by Wife to the marital residence and the existence of substantial personal property. In his financial statement of May 10, he declares separate bank accounts of $159,870 and securities of $9,240. He declares that the market value of the marital residence is $160,000 and, in a January 1984 declaration, that the equity is $50,000.

On May 25, 1983, Wife's petition for *ne exeat* came on for hearing. Although the record contains no proof of service of the petition on Husband, his counsel appeared at the hearing. The D.C. court issued an order holding Husband in contempt and sentencing him to 30 days in jail, suspended until June 6, and to be executed at that time unless he had transferred all his monies and securities outside the continental United States to a bank or brokerage house in the District of Columbia. The court made its order based on Husband's failure to abide by the TRO of May 10, his admission in court on May 10 that he had threatened his Wife that he would move to Europe if she did not accept his settlement offer, his failure to appear in court on May 20, and his having gone to Europe after assuring the court that he would not go until June. (The record does not include a supporting declaration re contempt or an order to show cause in re contempt.)

On July 13, 1983, on Wife's application, the D.C. court modified the support order to provide that Husband pay directly to Wife $2,135 per month, commencing on August 1. It also vacated the order requiring Husband to pay the monthly mortgage payment on the marital residence, but did not order Wife to make that payment (although she apparently had possession). Because Husband had failed to comply with the TRO of May 10, the court refused to consider evidence presented by Husband's counsel that Wife was receiving $567.50 per month from the New York State Teachers' Retirement System.

When Husband failed to pay the support as ordered, Wife attached his military pension.[2]

Around January 1984, Husband filed a petition for dissolution of marriage in California in the San Diego County Superior Court. In April 1984, the San Diego court issued an order abating that action unless and until such time as the D.C. court denied Husband's counterclaim for divorce "on the merits," and further ordered that Husband's proceeding in San Diego would "be forthwith dismissed" unless Husband complied with the orders of the D.C. court regarding the transfer of his assets within 90 days of March 14, 1984. By order of the San Diego court on June 6, 1984, this April 1984 order was extended to July 27, 1984, with the proviso that if no decision were reached in the D.C. court by that date, then the San Diego action would be dismissed, and Husband would be sanctioned if he returned

---

[2] Wife's counsel alleged in the Mendocino action that Husband was in arrears in the sum of $37,522.60 as of April 21, 1986, after deducting payments received. Husband alleged in that action that he receives only $625 per month after deduction of income taxes on the total amount and that Wife was currently receiving $1,079 per month from the levy on his military pension.

to court with another motion "based on essentially the same grounds as his motion which resulted in this order . . . ."

On June 18, 1984, Wife's complaint for legal separation and Husband's counterclaim for divorce came on for hearing in the D.C. court. Both Husband's and Wife's counsel were present; Wife was present and testified. Because Husband had remained outside the jurisdiction of the court, it refused to permit introduction of any of his evidence (including evidence that Wife was receiving retirement income of $567 and social security of $127 per month). There being no evidence of a change of circumstances, the court ordered Husband to pay permanent support to Wife in the same amount as the modified temporary support order—$2,135 per month. Wife was granted a legal separation from Husband, and each counsel was to submit a memorandum on the issues of whether the court had authority to sever Husband's counterclaim for divorce and keep it as a live action pending his return to the jurisdiction and whether the court had sufficient information to find that Husband had the ability to pay Wife's attorney fees and costs. The judgment was signed July 27, 1984.

On that same date, based on the memoranda submitted, the court made its order ordering Husband to pay Wife $20,225 for attorney fees, apparently based on Husband's financial declaration of May 1983. The court took no action on retention of jurisdiction over Husband's counterclaim for divorce; it was not even mentioned.

Husband's counsel moved for reconsideration of the court's refusal to grant a divorce on Husband's counterclaim, arguing that the grounds were clearly established by Wife's testimony and citing authority contrary to the court's position that it could not grant a divorce in the absence of the moving party. Counsel urged the court to reconsider its refusal to admit into evidence and consider the affidavits of Husband, his physician, and his California counsel. By order of September 14, 1984, the court denied the motion without comment.

Thus, the status of Husband's counterclaim for divorce in the D.C. court is presently unclear. That court has not filed a written order expressly denying Husband's request for a divorce, although it apparently refused to grant a divorce at the June 18, 1984, hearing on the ground that Husband was not personally present in court; nor has it ever expressly decided the question posed in its request on July 27, 1984, for memoranda on whether it had "the authority to sever [Husband's] counterclaim [for divorce] and preserve it as a live action pending [his] return" to D.C.[3] Thus, Husband's

[3] On appeal, Wife states that because Husband moved to dismiss his counterclaim for divorce in June 1984, and the D.C. court "denied" that motion in its September 17 order, Husband's counterclaim for divorce is still pending in that court. This ignores the fact that the

counterclaim for divorce had been in a state of limbo in the D.C. court for nearly two years before he filed his action in Mendocino County.

In March 1986, Husband filed the instant petition for dissolution of marital status in the Mendocino County Superior Court. Wife appeared specially and moved to quash the summons and dismiss the petition, arguing that there was another action pending in the D.C. court between Husband and Wife for the same cause, that Husband lacked the residency required by Civil Code section 4530, that there was no reasonable basis for the commencement of the instant action by Husband, and that Husband was engaging in " 'tactics or actions not based on good faith which are frivolous or which cause unnecessary delay.' " She asserted that his motives for seeking a divorce were to deprive her of survivor's benefits from his military pension and to make it more difficult for her to recover her separate property.

In opposition to Wife's motion, Husband filed a declaration stating that his medical condition had prevented him from returning to the jurisdiction of the D.C. court to answer the contempt charges; that he was not attempting to force Wife to litigate any property issues in California and expressly consented to the reservation of all such issues to the jurisdiction of the D.C. court; and that he sought only a dissolution of marital status so that he could remarry.

On May 21, 1986, the court below granted Wife's motion to quash summons and dismiss the action, stating, "[b]ecause James Gray failed to comply with [the orders of the D.C. court], it appears that the appropriate [forum] in this matter is in the District of Columbia, by an appropriate petition to reopen the dissolution." This appeal followed.

## II. *Discussion*

Husband contends that the trial court had jurisdiction to grant a status divorce to the parties and that it erred in refusing to do so. Citing rule 1230 of the California Rules of Court,[4] Wife argues that the trial court

---

D.C. court has never issued a written order expressly granting or denying either Husband's counterclaim for divorce or his motion to dismiss the counterclaim. We note that, contrary to Wife's position on appeal, counsel for Wife represented to the court below that the parties' litigation in D.C. was tried in mid-1984, "[a]nd the [D.C.] court granted Mrs. Gray's request for a legal separation and specifically denied Mr. Gray's request for an absolute divorce and denied it on a motion for rehearing." The trial judge herein also stated in his order granting Wife's motion to quash that Husband had "sought a divorce [in the D.C. court] and his petition was denied." The record does not include the motion by Husband to dismiss the counterclaim.

[4] Rule 1230 of the California Rules of Court provides in pertinent part: "(a) Within the time permitted to file a response, the respondent may move to quash the proceeding, in whole

properly granted the motion because there was "a prior judgment or another action pending between the same parties for the same cause." Wife also urges that Husband's attempt to obtain a status-only divorce in this state amounts to a collateral attack on the jurisdiction of the D.C. court, in violation of the constitutional requirements of full faith and credit. In our opinion, neither of Wife's arguments properly addresses the facts presented by the record in this case, which we have concluded compel the reversal of the trial court's order.

## A.

We begin with Civil Code section 4508, subdivision (b), which states, in pertinent part: ". . . A judgment decreeing the legal separation of the parties shall not bar a subsequent judgment decreeing the dissolution of the marriage rendered pursuant to a petition for dissolution filed by either party." This provision is based on the principle of divisible divorce, under which "financial responsibility and marital status may be separately litigated at different times and in different forums. Unresolved litigation on one aspect of the matrimonial relationship will not upset an adjudication of another aspect that has gone to final judgment." (*Faught* v. *Faught* (1973) 30 Cal.App.3d 875, 878 [106 Cal.Rptr. 751].) Thus, one spouse may not "postpone indefinitely the dissolution of a marriage" by prolonging proceedings dealing with financial responsibility and division of marital property. (*Id.,* at p. 879.)

One of the earliest statements of the principle of divisible divorce is found in *Estin* v. *Estin* (1948) 334 U.S. 541 [92 L.Ed. 1561, 68 S.Ct. 1213, 1 A.L.R.2d 1412], in which the United States Supreme Court held that different jurisdictions may separately adjudicate binding determinations of the marital status and property rights of the parties to a dissolution. In *Estin,* as in the instant case, a decree of separate maintenance was obtained first by the wife in one jurisdiction; the husband subsequently established a valid domicile in another state and sought a divorce. The Supreme Court pointed out that the state of the abandoned wife's domicile had an interest in her support; it could not be deprived of its jurisdiction over that subject by the state of the husband's new domicile. Conversely, however, the latter state did have jurisdiction to grant a divorce as to the parties' marital status. The full faith and credit clause of the United States Constitution compels recognition of the divorce decree as an adjudication of marital status only, without affecting or prejudicing any property rights that may be incident to that status. The effect, if any, of the dissolution of marital status on a prior decree of separate maintenance must be determined by the law of the juris-

---

or in part, for any of the following: . . . [¶] (2) That there is a prior judgment or another action pending between the same parties for the same cause. . . ."

diction which granted separate maintenance. (*Id.*, at pp. 543-549 [92 L.Ed at pp. 1565-1569]; see also *Hull* v. *Superior Court* (1960) 54 Cal.2d 139, 147-148 [5 Cal.Rptr. 1, 352 P.2d 161]; *Hudson* v. *Hudson* (1959) 52 Cal.2d 735, 739-743 [344 P.2d 295]; *Worthley* v. *Worthley* (1955) 44 Cal.2d 465, 468 [283 P.2d 19]; *Mehrstein* v. *Mehrstein* (1966) 245 Cal.App.2d 646, 649 [54 Cal.Rptr. 65]; *Jurczyk* v. *Jurczyk* (1965) 232 Cal.App.2d 270, 271 [42 Cal.Rptr. 660].)

 Here, Husband is seeking a dissolution of marital status *only*. Contrary to Wife's arguments, Husband challenges neither the jurisdiction of the D.C. court nor its determinations regarding support and the parties' marital property.[5] Thus, Wife's D.C. action for separate maintenance does not operate as a bar to Husband's attempt to obtain a dissolution of marital status in this state.

### B.

 Wife urges, however, that the instant action is barred on grounds of the priority of the D.C. litigation, in that Husband has sought to obtain a divorce as part of the D.C. proceedings by way of counterclaim, and his counterclaim for divorce is either still pending or has already been denied.
 In essence, Wife is arguing the general principle of jurisdiction that where two courts have concurrent jurisdiction over the same class of cases, the one which first assumes jurisdiction over the subject matter of a particular controversy takes it exclusively, and the other court's jurisdiction may not be asserted over that particular subject matter. (2 Witkin, Cal. Procedure (3d ed. 1985) Jurisdiction, § 341, pp. 760-761.) Where the conflict is between courts of different states with respect to a proceeding in rem, the rule giving priority to the first of two courts to take jurisdiction is generally

---

[5] Wife cites numerous cases in support of her argument that Husband is making an impermissible collateral attack on the decree and jurisdiction of the D.C. court. (*Sherrer* v. *Sherrer* (1948) 334 U.S. 343 [92 L.Ed. 1429, 68 S.Ct. 1087, 1 A.L.R.2d 1355]; *Fehlhaber* v. *Fehlhaber* (5th Cir. 1982) 681 F.2d 1015; *Peery* v. *Superior Court* (1985) 174 Cal.App.3d 1085 [219 Cal.Rptr. 882]; *In re Marriage of Stich* (1985) 169 Cal.App.3d 64 [214 Cal.Rptr. 919]; and *Craig* v. *Superior Court* (1975) 45 Cal.App.3d 675 [119 Cal.Rptr. 692].) To the extent they do not actually support Husband's petition for dissolution of marriage, the cases cited by Wife are all concerned with the res judicata effect of a jurisdictional finding of domicile in a divorce action. Husband does not contest or attack the subject matter jurisdiction of the D.C. court to render a divorce decree. For all intents and purposes, that court has already refused to grant a divorce. As for the disposition of the parties' support and property interests, Husband has expressly conceded the jurisdiction of the D.C. court over those separate matters. Wife's argument simply ignores the principle of divisible divorce. If we were to adopt her argument under the circumstances of this case, little would be left of that doctrine or the correlative and equally important principle that a final decree of divorce should not be withheld as a device for punishment. (See discussion, *infra*.) (*Hull* v. *Superior Court, supra,* 54 Cal.2d at p. 153 (conc. opn. of Traynor, J.); *De Burgh* v. *De Burgh* (1952) 39 Cal.2d 858, 864 [250 P.2d 598].)

stated in terms of "comity." (*Id.,* at §§ 346, 354, pp. 765-766, 776-777; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 1063, p. 477.)

■ The rule of jurisdictional priority is one of discretionary policy and does not necessarily control where countervailing policies apply. (*Childs* v. *Eltinge* (1973) 29 Cal.App.3d 843, 848-856 [105 Cal.Rptr. 864]; 2 Witkin, Cal. Procedure, Jurisdiction, *supra,* § 342, pp. 761-762.) As stated in *Simmons* v. *Superior Court* (1950) 96 Cal.App.2d 119 [214 P.2d 844, 19 A.L.R.2d 288]: "The general rule is that the 'pendency of a prior suit in one state cannot be pleaded in abatement or in bar to a subsequent suit in another state even though both suits are between the same parties and upon the same cause of action.' [Citation.] However, 'the court in which the second action is brought *may in its discretion* stay or suspend that suit, awaiting decision in the first one, or, influenced by a spirit of comity, *may* refuse to entertain it, if the same relief can be awarded in the prior suit.' [Citation.]" (*Id.,* at p. 123, italics added.)

■ In this case, as we have already noted, Husband's counterclaim for divorce is floating in a kind of legal limbo. Although apparently the D.C. court denied Husband's counterclaim for divorce at the June 1984 hearing, it is unclear from the record whether or not the matter is still pending before that court. Our review of the record and consideration of the facts presented therein have persuaded us that the principle of comity does not require the further deferral of the courts of this state to the action (or inaction) of the D.C. court on Husband's request for termination of his marriage to Wife, whatever the status of that request at present in the D.C. court.

Husband is seeking only the termination of his marital status. He has expressly consented to the reservation of all property issues to the D.C. court and the proceedings before it. Jurisdiction to dissolve the status of marriage is a form of jurisdiction in rem. The personal status of the parties to the marriage is considered the "res" or subject matter of the divorce proceeding. ■ California has jurisdiction over the personal status of persons who are domiciled within its borders. (*Delanoy* v. *Delanoy* (1932) 216 Cal. 27, 37-39 [13 P.2d 719, 86 A.L.R. 1321].) ■ Domicile is therefore the basis for jurisdiction in this marital dissolution action. (6 Witkin, Summary of Cal. Law (8th ed. 1974) Husband and Wife, § 71, p. 4943.)

■ The bona fide domicile of one spouse in a state is sufficient to give that state power to grant a valid divorce entitled to full faith and credit elsewhere. (*Williams* v. *North Carolina* (1942) 317 U.S. 287, 298-299 [87 L.Ed. 279, 286, 63 S.Ct. 207, 143 A.L.R. 1273]; *Baldwin* v. *Baldwin* (1946) 28 Cal.2d 406, 410 [170 P.2d 670]; *In re Marriage of Leff* (1972) 25

Cal.App.3d 630, 641 [102 Cal.Rptr. 195]; 6 Witkin, Summary of Cal. Law, Husband and Wife, *supra,* §§ 72-73, pp. 4944-4946.) ▮▮▮ As a result of the principle of divisible divorce and the fact that Husband has established a bona fide domicile in California, the courts of this state now have jurisdiction to act on Husband's petition for marital dissolution, whether or not any action between the parties is still pending in D.C.[6]

C.

▮▮▮ Nevertheless, Wife argues, Husband should not be permitted to bring his dissolution action here because to do so would encourage "forum shopping." Wife points out that "the reason that the [D.C.] court has not seen fit to allow [Husband] to either withdraw his [counterclaim for divorce] or to grant him relief thereon, is his continued contempt for that court's orders over a period of two years." Essentially, Wife's argument is that Husband's right to a divorce is, or should be, suspended until he has returned to D.C. and purged himself of the contempt order there. We cannot agree with this argument.

As the state of Husband's domicile, California has a strong social interest in Husband's marital status. This strong state interest in the marital status of individuals domiciled in California was cited by the Supreme Court in *Hull* v. *Superior Court, supra,* 54 Cal.2d 139, in upholding the right of a person to obtain a dissolution of marital status despite his or her misconduct. In *Hull,* the trial court had granted the wife's motion to bar entry of a final decree of divorce on the grounds that the husband had allegedly failed to comply with the terms of the parties' property settlement agreement. The husband petitioned for a writ of mandate to compel entry of the final decree, arguing that he was entitled to such entry as a matter of right.

The Supreme Court agreed, concluding that the trial court's barring of the entry of the final decree of divorce was an abuse of discretion because it amounted to using the continuation of the parties' marital status as a means of punishment. "To countenance such a procedure would be violative of the public policy of this state. That policy is not to discourage final and permanent severance of marriages that have failed. . . . The public interest is not enhanced by refusing people the right to legally terminate a relationship

---

[6]The situation faced by the San Diego County Superior Court in early 1984 was substantially different from that we address here. In that earlier action, the focus of litigation between the parties was still clearly in the D.C. court. Neither Wife's complaint for legal separation nor Husband's counterclaim for divorce had yet been heard or decided by the D.C. court, in which they were pending. The San Diego court properly refused to involve itself as a matter of comity in an action which was just about to be litigated and presumably decided in another jurisdiction.

which has already been irrevocably severed in fact." (*Hull* v. *Superior Court, supra,* 54 Cal.2d at p. 145.)[7]

Although the majority opinion in *Hull* held that the denial of a final decree of divorce could not be used as a form of punishment, in dictum it did leave open the power of a court to prevent final dissolution of a marriage "when necessary to preserve the authority of the court," as where a party is in contempt of the processes of the court or is guilty of "some improper conduct . . . [which is] directly related to the divorce proceeding." (*Hull* v. *Superior Court, supra,* 54 Cal.2d at pp. 145-146.)[8] ██ The separate concurring opinion of Justice Traynor went further, strongly stating the position that entry of a final decree of dissolution should be a matter of right in all cases, whether or not one of the parties could be held in contempt for not performing conditions of the court's orders. (*Id.,* at p. 151 (conc. opn. of Traynor, J.).) "When . . . there has been a final determination that the marriage should be dissolved, . . . the public interest in vindicating judicial dignity should yield to its interest in preserving the sanctity of marriage when the process sought to be withheld is a final decree of divorce, for '[i]t is a degradation of marriage and a frustration of its purposes when the courts use it as a device for punishment.' [Citation.]" (*Id.,* at p. 153 (conc. opn. of Traynor, J.).)

██ In the case before us, the D.C. court has concededly held Husband in contempt of its order of May 10, 1983.[9] Nevertheless, we agree with the

---

[7] "The marital relationship is severable from the property rights which it creates, and final settlement of the relationship should not be dependent upon final settlement of corollary property interests. [¶] The concept of divisible divorce has become established in our law. . . . [M]any cases have held that a divorce action which severs the personal relationship of the parties does not necessarily determine their property rights. . . . [T]hese cases . . . recognize the basic proposition that severance of the personal relationship is divisible from a determination of property and support rights. [¶] The divisible divorce is more than a jurisdictional concept. Severance of a personal relationship which the law has found to be unworkable and, as a result, injurious to the public welfare is not dependent upon final settlement of property disputes. Society will be little concerned if the parties engage in property litigation of however long duration; it will be much concerned if two people are forced to remain legally bound to one another when this status can do nothing but engender additional bitterness and unhappiness . . . . [¶] . . . Entry of the final decree is not a reward for good behavior nor is the refusal to grant it a punishment. Its purpose is to finally dissolve a relationship which has been severed in fact." (*Hull* v. *Superior Court, supra,* 54 Cal.2d at pp. 147-149.)

[8] "It is, of course, within the discretion of the trial court to bar entry of the final decree of divorce if the moving party is in contempt of an order or process of the court relating to the divorce action. [Citations.] This power exists even though there has been no prior adjudication of contempt and none is sought [citation]. . . . [¶] A court should have the right to deny its processes and aid to one who stands in contempt or is in contempt of its orders. One who has wilfully refused to comply with the mandate of a court cannot then compel that court to do his [or her] bidding." (*Hull* v. *Superior Court, supra,* 54 Cal.2d at pp. 144, 146.)

[9] Husband has not challenged the validity of the D.C. court's order holding him in contempt of court.

reasoning of Justice Traynor and hold that Husband was entitled to proceed with his petition for dissolution in California. The proffered justification for the lower court's order herein is, of course, comity and refusal to interfere with the D.C. court's jurisdiction over the parties' divorce. It is apparent from the record that the D.C. court's refusal to act on Husband's counterclaim for divorce was related to its previous order holding Husband in contempt, and that it was most probably intended, at least in part, to serve as a form of punishment meted out to Husband for that contempt.[10]

■ Neither comity nor the good faith and credit clause of the Constitution requires the enforcement by the courts of this state of any judgment from another jurisdiction which is penal in character. (*Nelson* v. *George* (1970) 399 U.S. 224, 229; [26 L.Ed.2d 578, 582-583, 90 S.Ct. 1963].) 5 Witkin, Summary of Cal. Law (8th ed. 1974) Constitutional Law, § 23, p. 3266

■ Moreover, 10 years after the decision in *Hull* v. *Superior Court, supra,* 54 Cal.2d 139, the Family Law Act came into effect, taking away from the marital dissolution procedure the last vestiges of the old concept of fault. (Civ. Code, div. fourth, pt. 5, § 4000 et seq.; 6 Witkin, Summary of Cal. Law, Husband and Wife, *supra,* § 63, pp. 4936-4938.) The main premise and priority of the Family Law Act was the elimination of the artificial fault standard. The Legislature's intent was to devise practicable procedures and a basis for marital dissolution that addressed the actual reasons underlying marital breakdown. (*In re Marriage of McKim* (1972) 6 Cal.3d 673, 678-679 [100 Cal.Rptr. 140, 493 P.2d 868]; *In re Marriage of Walton* (1972) 28 Cal.App.3d 108, 112, 116, 119 [104 Cal.Rptr. 472]; 6 Witkin, Summary of Cal. Law, Husband and Wife, *supra,* § 63, pp. 4937-4938.) Under the new law, if irreconcilable differences are affirmatively found to have caused the irremediable breakdown of the marriage (and residential requirements are met), dissolution *must* be ordered. (Civ. Code, § 4508, subd. (a).) Evidence of specific acts of misconduct is improper and inadmissible in any pleadings or proceedings for legal separation or dissolution, except where child custody is in issue and such evidence is relevant to that issue. (Civ. Code, § 4509.) It would be highly anomalous, and contrary to the intent of the Family Law Act, if the concept of fault were now to be smuggled in again, paradoxically in this case to *prevent* the final dissolution of a marriage which has admittedly broken down irremediably due to irreconcilable differences.

■ Today, more than a quarter of a century after Justice Traynor wrote his concurring opinion in *Hull,* his reasoning is all the more

---

[10] We also note that the D.C. court additionally sanctioned Husband by refusing to consider his proffered evidence on Wife's income when it modified temporary support and made its order for permanent support in the sum of $2,135 per month.

persuasive. We decline to return to the outmoded and discredited theory that fault should play a role in the decision whether to grant or deny a divorce between two parties whose marriage has in fact already ended. We recognize that Husband appears to be in contempt of the May 10, 1983, order of the D.C. court. Nevertheless, we conclude that the strong policy in California in favor of granting final dissolution of marriage where the relationship of the parties has irretrievably broken down, irrespective of any fault or misconduct by either of the parties, is of overriding importance. To deny Husband's request for a divorce under the circumstances presented by this case would make the California courts a party to the apparent attempt by the D.C. court to use the continuation of the marriage status as a means of punishment, in violation of the law and public policy of this state.

We must add, however, that we do not condone Husband's recalcitrance in working out an equitable disposition of the marital assets. We also question his wisdom in not considering the impact of a pending legal action on the administration of his estate and in allowing support arrearages to accrue in a rather large amount.

### III. *Disposition*

We hold that the refusal of the court below to entertain Husband's petition for marital dissolution constituted an impermissible use of the status of marriage as a device for punishment and was an abuse of its discretion.

The order granting Wife's motion to quash the summons and dismiss the proceedings is reversed, and the matter is remanded to the Superior Court in and for the County of Mendocino for further proceedings on the petition for dissolution of marriage.

White, P. J., and Merrill, J., concurred.