[No. B195862. Second Dist., Div. Eight. Dec. 2, 2008.]

JAVA OIL LIMITED et al., Plaintiffs and Respondents, v. HAROLD V. SULLIVAN II, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part III. of the Discussion.

**COUNSEL**

Harold V. Sullivan II, in pro. per.; Mathews & Weisser and C. Granville-Mathews for Defendant and Appellant.

Mitchell Silberberg & Knupp, David A. Steinberg and Paul Guelpa for Plaintiffs and Respondents.

**OPINION**

**COOPER, P. J.**—Harold V. Sullivan II appeals from a judgment entered pursuant to the former Uniform Foreign Money-Judgments Recognition Act (UFMJRA). (Code Civ. Proc., former § 1713 et seq.) He argues that attorney fee awards entered by a court in Gibraltar constituted a penalty, violated California public policy, and should not be recognized. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Peter Laycock, a California resident, sued Java Oil Limited (Java) and Brightside Services Limited (Brightside; collectively respondents) in the Supreme Court of Gibraltar, which the record indicates is a lower court akin to the California Superior Court.[1] Harold Sullivan II (Sullivan or appellant) is a California attorney who assisted Laycock with the litigation in Gibraltar.

---

[1] Appellant cites to British law but makes no request that we take judicial notice of it. Respondents, in a footnote, ask that we take judicial notice of a case attached to their motion for summary judgment but provide no citation to the location of the case in the appellate record and no separate motion for judicial notice. This is inconsistent with the requirement to obtain judicial notice in a reviewing court. (*Kinney v. Overton* (2007) 153 Cal.App.4th 482, 497, fn. 7 [63 Cal.Rptr.3d 136]; Cal. Rules of Court, rule 8.252(a)(1); see also *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 469, fn. 7 [11 Cal.Rptr.2d 330, 834 P.2d 1148].)

## 1. *Gibraltar Litigation*

### A. *Laycock's Lawsuit (the Underlying Litigation)*

In an order dated September 8, 2004, authored by Chief Justice Schofield, the Gibraltar court found all of the following: Peter Laycock claimed that he was injured at a construction site where Brightside was excavating a pipeline owned by Java. Laycock claimed brain damage, aggravation of back and neck injuries, permanent deterioration in the frontal and prefrontal lobes of the brain, organic mood disorder, an impairment to his ego structure and personality, and complete disability. Laycock was not hospitalized for his injuries.

Laycock sought almost £2 million in damages as a result of loss of business including business in Mexico, the United States, and Gibraltar. The business in Gibraltar appeared to be only in an exploratory stage. The claim of loss of business in Mexico appeared to be fraudulent, but the court granted Laycock an additional opportunity to respond.

The claim against Java was dismissed in an order dated July 7, 2004. On November 16, 2004, the court dismissed the claim against Brightside and ordered Laycock to pay the costs of the action incurred by both respondents.

### B. *Respondents' Lawsuit Against Sullivan (First Judgment)*

On September 6, 2005, in an opinion authored by Chief Justice Schofield, the court found that Sullivan had been given notice of a hearing on respondents' claims against him. The court ordered Sullivan to pay the costs incurred by respondents in the underlying litigation. In a judgment dated October 17, 2005, after noting that this case was "unusual," Judge Schofield explained the basis for awarding costs against a nonparty as follows: Respondents alleged that Sullivan was complicit in the fraud. Sullivan filed a

---

On our own motion pursuant to Evidence Code section 452, subdivisions (c) and (f) and section 459, we take judicial notice of the prior cases between the parties and between respondents and Laycock, contained in the record. These include the following Supreme Court of Gibraltar orders in *Laycock v. Java Oil Ltd. & Brightside Services Ltd.* (Claim No. 2003-P-209): July 7, 2004 order; September 8, 2004 order; and November 16, 2004 order. We also take judicial notice of the proceedings in *Laycock v. Java Oil Ltd.* and *Brightside Services Ltd. v. Sullivan* in the same case including: September 6, 2005 order; September 9, 2005 order; October 17, 2005 judgment; July 13, 2006 order; and March 22, 2006 order. Finally, we take judicial notice of the bankruptcy proceedings in *In re Sullivan* (E.D.Cal., June 20, 2006, No. 05-30713-A-13) 2006 WL 1686732, page *4, including: November 28, 2005 civil minutes; November 28, 2005 order granting motion for order annulling the automatic stay and for dismissing bankruptcy case; and June 20, 2006 order affirming the annulment of the automatic stay.

bankruptcy petition "to avoid the effects of the proceedings in this claim." Following a two-day hearing in which Sullivan failed to appear, the court found "Sullivan had been guilty of complicity in Mr. Laycock's fraudulent claims and ordered that he pay the defendants' costs on an indemnity basis." In ruling against Sullivan, the court "required proof that Mr. Sullivan was acting in bad faith in being a party to putting false evidence before the Court." The court found Sullivan lied to the court. Sullivan played a "supervisory role" in the preparation of fraudulent documents presented to the court.

As part of a lengthy opinion, Judge Schofield explained: "Despite Mr. Sullivan's protestations of innocence, from all the evidence I was satisfied that he was involved in the preparation of the false evidence . . . I was satisfied that Mr. Sullivan involved himself in Mr. Laycock's claim and that his intervention was in bad faith in that he was a party to the concoction of false evidence in pursuit of the claim. . . . The claim had to be answered by the defendants who have expended considerable sums of money in proving the falsity of the evidence. I concluded that costs should be borne by Mr. Sullivan." "It is impossible to separate the actions of Mr. Laycock and Mr. Sullivan in their pursuit of the claim."

The Gibraltar court cited to the English Supreme Court Act 1981, quoting it as follows:

" '51.—(1) subject to the provisions of this or any other enactment and to rules of court, the costs of and incidental to all proceedings in—

" '(a) the civil division of the Court of Appeal;

" '(b) the High Court; and

" '(c) any county court, shall be in the discretion of the court. [¶] . . . [¶]

" '(3) The court shall have full power to determine by whom and to what extent the costs are to be paid.' "

The judgment indicated the costs were to be assessed by the registrar. The registrar found the costs to be £621,958.75.

### C. *Attorney Fee Litigation for Lawsuit Against Sullivan (Second Judgment)*

Subsequently, in an opinion dated March 22, 2006, the registrar concluded the costs incurred by respondents in prosecuting the claim against Sullivan as subsequently corrected to be £1,154,025. That amount was in addition to the £621,958.75 award in the first judgment. A hearing of the proceedings before the registrar is included in the record and indicates that Sullivan was represented by counsel who participated by phone. The registrar stated that, to establish that Sullivan intervened in bad faith, "requires copious collection of evidence because how do you establish that someone has intervened without investigating. This is further complicated by the geographical distances. And both investigations in the US and Mexico that had to be carried out in order to establish this intervention and the effect of this intervention."

### 2. Federal Litigation

#### A. *Bankruptcy Court*

As mentioned, just prior to the hearing in Gibraltar on respondents' claim against Sullivan, Sullivan filed a chapter 13 bankruptcy petition. The bankruptcy court considered the consequence of the Gibraltar court's proceeding after the bankruptcy petition had been filed. In an opinion dated November 28, 2005, the bankruptcy court concluded that absent the annulment of the automatic stay, the acts would be void. It concluded the facts favored annulling the bankruptcy stay. "The court concludes that the failure of the debtor [Sullivan] to list the movants' million dollar plus claim was for the sole purpose of making it appear he qualified for chapter 13 relief. As such, the schedules were filed in bad faith and the court will look beyond them when determining his eligibility for chapter 13 relief." Sullivan also failed to be candid with the court, trustee, and creditors regarding his income.

#### B. *District Court*

The case was appealed to district court. On June 20, 2006, the federal district court issued an opinion finding the Gibraltar action was dismissed because Laycock's complaint was fraudulent. Five days before a hearing on whether Sullivan should be liable for the costs of suit, Sullivan filed a chapter 13 bankruptcy petition. The bankruptcy court found that Sullivan filed his petition in bad faith; Sullivan did not disclose his spouse's income or his 2004 or 2005 income, and misstated the nature, sources and regularity of his

income. Sullivan failed to list claims. The bankruptcy court properly annulled the stay because Sullivan acted in bad faith, and judicial economy militated in favor of resolving the Gibraltar lawsuit. The bankruptcy court "explained that creditors were faced with what to do once Sullivan filed for bankruptcy 'in bad faith.' "

3. *Los Angeles Superior Court Action*

Respondents filed a complaint against Sullivan requesting the trial court enter judgment on a foreign money judgment pursuant to the UFMJRA. (A separate lawsuit against Laycock was joined, but Laycock is not a party to this appeal.)

Richard Melville, a member of Queen's Counsel, was the only witness who testified at trial. Melville was certified to practice law in Gibraltar. He defended respondents in the litigation brought by Laycock. He testified regarding the documents received from the Supreme Court of Gibraltar to authenticate those documents. (No dispute with respect to the authentication of the documents is raised on appeal.) Melville testified no punitive damages were sought or awarded. On cross-examination, Sullivan's attorney asked Melville about specific cost items including the cost of surveillance of Sullivan in order to serve him.

The trial court concluded that the judgments of the Gibraltar court were not fines or penalties, they were final, conclusive, and enforceable where rendered, and were not subject to any exceptions. On December 8, 2006, the superior court awarded judgment of $3,159,758.50, plus costs of suit in favor of respondents. That amount included the award in the first judgment and that in the second judgment. Sullivan timely appealed.

## DISCUSSION

In the trial court, respondents asked the court to recognize and enforce the Gibraltar judgments pursuant to the UFMJRA. The California Legislature amended that Act in 2007, while this case was pending. The Legislature made clear that the prior version applies to this case, which commenced in 2005. (Code Civ. Proc., § 1724, subd. (b) ["The former Uniform Foreign Money-Judgments Recognition Act . . . applies to all actions commenced before the effective date of this chapter in which the issue of recognition of a foreign-country judgment is raised."].) Therefore, we apply the former statutes. (Unless otherwise indicated, statutory citations to the UFMJRA are to the statutes before the 2007 amendment.)

■ The UFMJRA, a 1962 Act, is in effect in over 30 states and was an effort to codify the law on recognition of judgments from foreign countries. (*Kam-Tech Systems Ltd. v. Yardeni* (2001) 340 N.J. Super. 414 [774 A.2d 644, 648].) The codification was based on rules that had already been applied in a majority of courts. (13 pt. 2 West's U. Laws Ann. (2002) U. Foreign Money-Judgments Recognition Act, p. 39.) Subject to certain exceptions, a foreign judgment "is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit . . . ." (Code Civ. Proc., former § 1713.3.) Article IV, section 1, of the United States Constitution provides that, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."

■ A foreign judgment excludes a judgment for a penalty. (Code Civ. Proc., former § 1713.1.)　■　A foreign judgment is not conclusive if the foreign court did not have personal jurisdiction over the defendant. (Code Civ. Proc., former § 1713.4, subd. (a)(2); *Bank of Montreal v. Kough* (N.D.Cal. 1977) 430 F.Supp. 1243, affd. (9th Cir. 1980) 612 F.2d 467.)　■　The foreign judgment is not conclusive if it was rendered in a court that does not provide due process of law. (Code Civ. Proc., former § 1713.4, subd. (a)(1); *Bank Melli Iran v. Pahlavi* (9th Cir. 1995) 58 F.3d 1406, 1413 [evidence that Iranian regime does not believe in independence of judiciary and evidence of anti-American sentiment supported district court's conclusion that Iranian judgment was not enforceable].)　■　A judgment "need not be recognized if" the defendant was not given notice in time to defend; the judgment is repugnant to public policy; the judgment conflicts with another final and conclusive judgment or if the foreign court was a seriously inconvenient forum. (Code Civ. Proc., former § 1713.4, subd. (b).) Sullivan argues that based on each of these grounds the trial court should not have enforced the Gibraltar judgments.

## I. *The Judgment Did Not Include a Penalty*

By definition, a foreign judgment does not include a judgment for a penalty. Therefore, whether the award requiring Sullivan to pay attorney fees constituted a penalty, as Sullivan now argues, is a threshold question. (Sullivan previously argued in this court that "[t]he trial transcript makes it clear that the LASC judgment was for attorneys' fees and costs and was not a penalty.")

To define "penalty" in this context, we look to cases discussing the enforcement of sister state judgments made relevant by the UFMJRA's statement that foreign judgments should be enforced in the same manner as sister state judgments. (Code Civ. Proc., former § 1713.3.) We also consider cases discussing the enforcement of foreign judgments under principles of comity, as the UFMJRA was an effort to codify the majority practice. Finally, the Restatement of the Foreign Relation Laws of the United States also is instructive. These sources present a uniform definition of "penalty," one that Sullivan ignores.

■ More than a century ago, the United States Supreme Court explained that the term "penalty" has multiple definitions, only one of which applies in the context of the enforcement of judgments. The high court held: "The question whether a statute of one State, which in some aspects may be called penal, is a penal law in the international sense, so that it cannot be enforced in the courts of another State, depends upon the question whether its purpose is to punish an offence against the public justice of the State, or to afford a private remedy to a person injured by the wrongful act." (*Huntington v. Attrill* (1892) 146 U.S. 657, 673–674 [36 L.Ed. 1123, 13 S.Ct. 224].) "The test is not by what name the statute is called by the legislature or the courts of the State in which it was passed, but whether it appears to the tribunal which is called upon to enforce it to be, in its essential character and effect, a punishment of an offence against the public, or a grant of a civil right to a private person." (*Id.* at p. 683.) "Crimes and offences against the laws of any State can only be defined, prosecuted and pardoned by the sovereign authority of that State; and the authorities, legislative, executive or judicial, of other States take no action with regard to them, except by way of extradition to surrender offenders to the State whose laws they have violated, and whose peace they have broken." (*Id.* at p. 669.)

■ This test has been followed in California. (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 837 [142 P.2d 297]; see also *Farmers & Merchants Trust Co. v. Madeira* (1968) 261 Cal.App.2d 503, 508 [68 Cal.Rptr. 184].) " '[T]he question is not whether the statute is penal in some sense. The question is whether it is penal within the rules of private international law. A statute penal in that sense is one that awards a penalty to the state, or to a public officer in its behalf, or to a member of the public, suing in the interest of the whole community to redress a public wrong. [Citations.] The purpose must be, not reparation to one aggrieved, but vindication of the public justice. . . .' [Citations.]" (*Chavarria v. Superior Court* (1974) 40 Cal.App.3d 1073, 1077 [115 Cal.Rptr. 549], quoting *Loucks v. Standard Oil Co.* (Ct.App. 1918) 224 N.Y. 99 [120 N.E. 198] (*Loucks*).) Applying this rule, treble damages,

double damages, and minimum fines were considered penalties. (*Miller v. Municipal Court*, at p. 837; see also *In re Marriage of Gray* (1988) 204 Cal.App.3d 1239, 1253 [251 Cal.Rptr. 846].)

The test in the Restatement of the Law, The Foreign Relations Law of the United States (Restatement) is consistent. The Restatement explains that courts "in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of other states." (Rest.3d Foreign Relations Law of the U.S., § 483, p. 611.) "A penal judgment, for purposes of this section, is a judgment in favor of a foreign state or one of its subdivisions, and primarily punitive rather than compensatory in character. A judgment for a fine or penalty is within this section; a judgment in favor of a foreign state arising out of a contract, a tort, a loan guaranty, or similar civil controversy is not penal for purposes of this section. . . . [¶] Some states consider judgments penal for purposes of nonrecognition if multiple, punitive, or exemplary damages are awarded, even when no governmental agency is a party. . . . In the United States, such judgments are not considered penal for this purpose." (*Id.*, com. b, pp. 611–612.)

 Sullivan unpersuasively and without citation to relevant authority asserts that because attorney fees are a weapon in deterring groundless litigation and akin to punitive damages they are "clearly penal."[2] Applying the definition of "penalty" in the context of the enforcement of judgments to this case, the attorney fees awards were not penalties. Sullivan was not being punished for an offense against the public but instead was ordered to compensate respondents for the fees they incurred in defending a lawsuit. The award was not payable to the state or to the court but instead to respondents. The judgment arose from a civil action, not from an enforcement of the penal laws of Gibraltar. The damages were not designed to provide an example or punish Sullivan. Sullivan questioned certain of those costs at the trial but did not argue or show that there was a different basis for the judgment. No

---

[2] Civil Code section 3294, subdivision (a) governs punitive damages and provides that "[i]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Punitive damages "further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 116 S.Ct. 1589].) Punitive damages "operate as 'private fines' intended to punish the defendant and to deter future wrongdoing." (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 432 [149 L.Ed.2d 674, 121 S.Ct. 1678].) Punitive damages are an expression of "moral condemnation." (*Ibid.*) In contrast, compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." (*Ibid.*)

mandatory fine, sanction, or multiplier was imposed. Thus, although Sullivan views the attorney fee award as a penalty for groundless litigation, it was not a penalty within the meaning of the UFMJRA. (*Erbe Elektromedizin GMBH v. Canady* (W.D.Pa. 2008) 545 F.Supp.2d 491, 496 [awarding attorney fees is not penal in nature and qualifies as a foreign judgment]; cf. *Loucks, supra,* 120 N.E. at pp. 198–199 [punishment of offender with the purpose of reparation to the aggrieved was not penalty].)

## II. *The Attorney Fees Are Not Repugnant to Public Policy*

A foreign money judgment need not be recognized if "the cause of action on which it is based 'is repugnant to the public policy of this state.' " (*Pentz v. Kuppinger* (1973) 31 Cal.App.3d 590, 597 [107 Cal.Rptr. 540]; see Code Civ. Proc., former § 1713.4, subd. (b)(3).) The standard is not simply that the law is contrary to our public policy, but instead that the judgment is so offensive to our public policy as to be " ' "prejudicial to recognized standards of morality and to the general interests of the citizens . . . ." ' " (*Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [216 Cal.Rptr. 412, 702 P.2d 570] [applying common law principles of comity to determine applicability of foreign law]; see *Crockford's Club Ltd. v. Si-Ahmed* (1988) 203 Cal.App.3d 1402, 1406 [250 Cal.Rptr. 728] (*Crockford*) [applying rule in context of enforcing British judgment]; see also *Society of Lloyd's v. Turner* (5th Cir. 2002) 303 F.3d 325, 333, fn. 34 [applying the Texas UFMJRA]; see also *McCord v. Jet Spray Intern. Corp.* (D.Mass. 1994) 874 F.Supp. 436, 439 [applying the Massachusetts UFMJRA].)

Sullivan's principal argument is that the Gibraltar judgments violate the American rule governing attorney fees. Throughout his brief, Sullivan reiterates that generally, in America, absent a statute or contractual provision, attorney fees are paid by the party employing the attorney. That is an accurate statement of the general law. (Code Civ. Proc., § 1021; *Santisas v. Goodin* (1998) 17 Cal.4th 599, 607, fn. 4 [71 Cal.Rptr.2d 830, 951 P.2d 399]; *City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 115 [48 Cal.Rptr.2d 42, 906 P.2d 1196].)

In contrast, in England, since 1607, courts have been empowered to award attorney fees to the successful litigant. (*Fleischmann Corp. v. Maier Brewing* (1967) 386 U.S. 714, 717 [18 L.Ed.2d 475, 87 S.Ct. 1404].) "In England, a defendant need not worry about being saddled with the costs of a

successful defense. The English rule is that generally the loser must pay the winner's attorneys fees. Thus, an English plaintiff who brings a frivolous suit does so at the peril of paying his adversary's litigation expenses [citations]." (*Engel v. CBS, Inc.* (2d Cir. 1999) 182 F.3d 124, 128.)[3]

In the United States, " 'The American Rule has been perpetuated because it represents a democratic ideal. Unfettered access to the courts for all citizens with genuine legal disputes has become a cornerstone of the American concept of justice.' " (*Mihalik v. Pro Arts, Inc.* (6th Cir. 1988) 851 F.2d 790, 793.) " 'The American Rule also reflects an equitable principle that penalizing a party for merely defending or prosecuting a lawsuit is unfair.' " (*Id.* at p. 794.) In addition, it relieves the courts of the burden of calculating reasonable costs of a party. (*Ibid.*)

We apply these principles to consider separately the fees awarded in the first and second judgments. We conclude that neither fee award is repugnant to California public policy.

A. *First Judgment*

Throughout his brief, Sullivan intimates that the American rule embodies a fundamental policy diametrically at odds with the English rule. With respect to the attorney fee award in the first judgment, we agree with the trial court that the Civil Code section 51 claim was similar to a malicious prosecution action even though as Sullivan points out it was not identical. The Gibraltar court found Sullivan was complicit in fraud, acted in bad faith, was a party to submitting false evidence and, as a result, caused respondents to incur considerable attorney fees.[4]

 In the malicious prosecution context, attorney fees are recoverable as damages. (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 59 [118 Cal.Rptr. 184, 529 P.2d 608].) Awarding attorney fees in this context therefore is consistent with California public policy. Even Sullivan states that it is a matter of "fundamental public policy in California" to be free of maliciously instituted proceedings. The award for attorney fees incurred in defending a

---

[3] The Second Circuit included the opinion of the New York Court of Appeals (its highest court) on a certified question. The quoted language is from the New York Court of Appeals.

[4] A malicious prosecution requires showing the underlying action " '(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in . . . plaintiff's . . . favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' " (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676 [34 Cal.Rptr.2d 386, 881 P.2d 1083].)

lawsuit that was the result of Sullivan's bad faith conduct and based on false evidence is not repugnant to California public policy.

### B. *Second Judgment*

Sullivan correctly points out that in addition to fees for defending the underlying action, respondents also recovered the fees incurred in prosecuting their claim against him. Other courts have considered whether attorney fees awarded under the English rule are enforceable. Applying Pennsylvania law, the Third Circuit upheld an award of attorney fees following a default judgment entered by a British court. (*Somportex Limited v. Philadelphia Chewing Gum Corp.* (3d Cir. 1971) 453 F.2d 435 (*Somportex*).) The damages were awarded for a contract cause of action and Pennsylvania law did not allow for the recovery of such damages. (*Id.* at p. 443.) Applying principles of comity, *Somportex* explained that the variance with Pennsylvania law " 'is not such that the enforcement "tends clearly to injure the public health, the public morals, the public confidence in the purity of the administration of the law, or to undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel, is against public policy." ' " (*Id.* at pp. 441, 443.)

*Somportex* was followed by the District of Columbia Circuit's upholding an award of attorney fees as part of an Israeli court's judgment. (*Tahan v. Hodgson* (D.C. Cir. 1981) 213 U.S. App.D.C. 306 [662 F.2d 862, 867, fn. 20].) The same conclusion was reached in *Erbe Elektromedizin GMBH v. Canady*, *supra*, 545 F.Supp.2d at page 497. "Although attorneys' fees may not have been recoverable under Pennsylvania or United States patent law, the recovery of those fees is not repugnant to public policy." (*Ibid.*)[5] Sullivan cites no contrary authority.

Nor does Sullivan show that the policies underlying the American rule would be furthered by denying enforcement of the attorney fees award in this case. The policy underlying the American rule is that "since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and . . . the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. . . . Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration." (*Fleischmann*

---

[5] Another district court reached the same conclusion in considering whether attorney fees awarded in Argentina should be enforced. (*Browne v. Prentice Dry Goods, Inc.* (S.D.N.Y., June 4, 1986, No. 84 Civ. 8081) 1986 U.S.Dist. Lexis 24632.)

*Corp. v. Maier Brewing, supra*, 386 U.S. at p. 718, citations omitted.) This is not a case where Sullivan was penalized merely for prosecuting a lawsuit, but instead he was ordered to pay costs for his complicity in filing fraudulent claims and the preparation of false evidence.

Sullivan argues that only the Legislature can modify the American rule. He relies on *Alyeska Pipeline Co. v. Wilderness Society* (1975) 421 U.S. 240, 247 [44 L.Ed.2d 141, 95 S.Ct. 1612], in which the court stated that "it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation" to create an exception to the American rule. However, here the issue is the enforcement of a judgment based on a different law, not the modification of the American rule. We are not asked in this case to provide an exception to the American rule, and Sullivan's argument on that point is irrelevant.

Sullivan identifies other laws that he believes are different in California and Gibraltar. For example, he argues that under California law, he would have been able to assert the litigation privilege under Civil Code section 47 (if the cause of action were not malicious prosecution). He argues that, under California law, malicious prosecution would be the sole available remedy and that the Gibraltar court did not identify or find all of the elements of a California cause of action for malicious prosecution. He points out that the attorney fees were awarded in two separate judgments—one litigation demonstrating that Sullivan was complicit in Laycock's fraud and then a separate request for fees incurred in that litigation. He discusses at length California statutes governing sanctions. None of these statements demonstrate that the attorney fees award is contrary to California public policy. That there is a difference in the law of the two countries does not show that the British law applied is repugnant to California public policy. (*Crockford, supra*, 203 Cal.App.3d at p. 1406; see also *Society of Lloyd's v. Turner, supra*, 303 F.3d at pp. 332–333.)[6]

III. *Sullivan's Remaining Arguments Are Unpersuasive*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] In *Crockford*, the court found that public policy supported enforcing a British judgment for a debt obtained in a casino in England. (*Crockford, supra*, 203 Cal.App.3d at p. 1406.) "In view of the expanded acceptance of gambling in this state as manifested by the introduction of the California lottery and other innovations . . . it cannot seriously be maintained that enforcement of said judgment 'is so antagonistic to California public policy interests as to preclude the extension of comity . . . .' " (*Ibid.*, citation omitted.)

[*]See footnote, *ante*, page 1178.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

Flier, J., and Bigelow, J., concurred.