Filed 4/30/25  Racicot v. Wiseau Studio CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| MARTIN RACICOT et al., | B334219 |
| Plaintiffs and Respondents, | Los Angeles County Super. Ct. No. 21STCP03990 |
| v. | |
| WISEAU STUDIO, LLC, et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elaine Lu, Judge.  Affirmed.

Tesser | Grossman, Brian M. Grossman and Alec Pierce Schulman for Defendants and Appellants.

Goode Hemme and Jerry D. Hemme for Plaintiffs and Respondents.

———————————

Wiseau Studio, LLC and Tommy Wiseau dba Wiseau-Films (collectively, appellants) appeal from the trial court's judgment of $1,089,010.16 entered in favor of Room Full of Spoons Inc., Richard Harper, Fernando Forero McGrath, Martin Racicot dba Rockhaven Pictures, Parktown Studios Inc., and Richard Stewart Towns (collectively, respondents).  Respondents petitioned the Los Angeles Superior Court to recognize a Canadian judgment they had obtained against appellants.  The trial court granted the petition and recognized the judgment under the Uniform Foreign-Country Money Judgments Recognition Act (UFCA), adopted by California under Code of Civil Procedure section 1713 et seq. (the Act).[1]  Defendants contend the court erred in recognizing the judgment under the Act because (1) the judgment effectively was a penalty precluding the Act's application, and (2) the proceedings in the Canadian court were "incompatible with due process."  We affirm.

**BACKGROUND**[2]

In June 2003, appellants released the feature film *The Room*.  Although a box office flop,[3] the film developed a cult-like following.  The film is screened monthly at "theatres all over the world."  Wiseau, who wrote, produced, directed,

---

[1]     Undesignated statutory references are to the Code of Civil Procedure.

[2]     We take the underlying facts of the case from the Canadian court's written "Reasons for Judgment" and other written rulings it references.

[3]     Critics described the film as " 'not just bad—it's intoxicatingly awful,' " the " 'Citizen Kane of bad movies,' " and a " '99 minute train wreck.' "

and starred in *The Room*, often attends these screenings and has become "somewhat of a celebrity."

In 2011, Wiseau's co-star in *The Room* and friend, Greg Sestero, wrote a nonfiction book about the making of *The Room* called *The Disaster Artist—My Life Inside The Room, The Greatest Bad Movie Ever Made*. A film adaptation of the book —*The Disaster Artist*—was released in 2017 to broad critical acclaim. Wiseau gave interviews, access to the original script of *The Room*, and behind the scenes photographs and footage to the author. He also entered into licensing agreements with the filmmakers for use of footage from *The Room* and appeared in *The Disaster Artist*.

Also in 2011, Harper and his friends McGrath and Racicot sponsored a screening of *The Room* in Ottawa, Canada that included an appearance by Wiseau for a $1,500 fee. Harper and his friends "hit it off" with Wiseau. After spending time with Wiseau in Ottawa and Toronto, "and with Wiseau's encouragement," they decided to make a documentary about *The Room* and its fans. A couple of months later, however, Wiseau no longer wanted to participate in the documentary.

Respondents worked on the documentary, called *Room Full of Spoons*, until early 2016. In addition to interviewing actors and fans, respondents "investigated Wiseau's background," including by interviewing Wiseau's family in Poland. To finance the film, respondents invested personal funds and raised money through Kickstarter, a crowdfunding website.

In March 2014, while making the documentary, Harper and McGrath attended Sestero's book signing event at a bookstore in Toronto. Wiseau was there. All four met later that evening for dinner. Wiseau asked about the documentary

and said "he was not against it and hoped it would succeed." However, a year later—in March 2015—Wiseau began to express disapproval of the documentary. He demanded respondents stop using footage from *The Room* in the documentary and remove all references to him from the Kickstarter campaign.

Harper proposed to Wiseau that they negotiate a license agreement. In addition to significant payment for each clip of *The Room* used in the documentary, Wiseau's proposed agreement gave Wiseau final approval of the documentary and required it to focus on the fans rather than on *The Room* or Wiseau. Harper told Wiseau respondents would allow him to view the film before any public release, but they would not agree "to give up 'Final-Cut Privileges' to him." In response, from April 2015 until February 2016, Wiseau attacked the documentary through a YouTube web-series. Wiseau continued to demand payment for the use of clips from *The Room* and— asserting copyright and trademark infringements—demanded respondents not use his name and change their promotional posters.

Respondents completed the documentary in January 2016. Seven minutes of the 109-minute *Room Full of Spoons* are clips from *The Room*. The documentary tells Harper's story of his interest in *The Room* and in Wiseau, describes how *The Room* was made and reactions to it, and addresses questions about how Wiseau funded *The Room* and his secretive background, including where he was born and his age—questions raised in *The Disaster Artist*.

On February 23, 2016, respondents gave Wiseau a " 'courtesy copy' " of the documentary. Wiseau objected to references to his original name and birthdate, the time the

film devoted to his family in Poland, references to a California civil action against him for fraud, and reference to claims by *The Room's* script supervisor that he actually directed 90 percent of the film. He also complained the documentary was " 'too negative' " and noted there were more than 65 clips from *The Room* and Wiseau-Films original material. Respondents rejected Wiseau's objections and took the position the clips were " 'covered under fair use.' "

In 2016 and early 2017, *Room Full of Spoons* was screened at 10 film festivals in Europe and North America. The screenings received positive attention. Wiseau emailed exhibitors and potential exhibitors of the film, alleging copyright infringement and illegal downloading of *The Room*, demanding the documentary not be shown, and his image and references to *The Room* not be used in promoting the documentary. As a result, a planned tour of 25 North American cities, and screenings scheduled in Australia, Poland, and the United Kingdom in 2016 and 2017 were canceled.

In 2017, respondents were in discussions with an independent film distributor in California, Gravitas Ventures, LLC (Gravitas). Gravitas had offered respondents a draft distribution agreement for a 15-year term covering the United States and Canada. Gravitas was excited about the prospect of releasing the documentary at around the same time as the release of *The Disaster Artist* in late 2017.

On June 14, 2017, however, appellants filed a lawsuit against respondents in Toronto and moved ex parte for an injunction to prevent the release of *Room Full of Spoons*. Respondents were given inadequate notice and could not appear at the hearing. Justice Diamond of the Canadian court granted

an interim injunction and set a return date for June 23, 2017, to determine whether the injunction should be extended through trial.  On June 23, at respondents' request, Justice Akbarali continued the hearing—and the injunction—to October 10, 2017, to allow respondents to retain counsel and gather evidence.

In September 2017, while the injunction was in effect, the film *The Disaster Artist*—a $10 million Hollywood production starring James Franco as Wiseau—premiered at the Toronto International Film Festival.  The film is a dramatized version of the making of *The Room*.

Due to the injunction and litigation, respondents could not complete the distribution agreement with Gravitas.  Gravitas would not move forward with the deal until the claim was resolved.  Respondents also could not distribute DVDs or otherwise release copies of the documentary while the litigation continued.  Some contributors to respondents' Kickstarter campaign asked for their money back because they had not received a copy of the documentary as promised.  Respondents also lost the opportunity to release *Room Full of Spoons* around the same time as *The Disaster Artist*.

Justice Koehnen held the continued hearing on the injunction on October 10, 2017.  Before the hearing, Wiseau "failed to attend for cross-examination" on the affidavit he had filed in support of the injunction.  Respondents, therefore, were unable to obtain any financial information from Wiseau as to his income from *The Room* and *The Disaster Artist*. In detailed "Reasons" released on November 1, 2017, Justice Koehnen dissolved the injunction, finding appellants failed to make " '[a] proper disclosure' " of the true facts at the earlier

ex parte hearing.[4]  In January 2018, Justice Koehnen awarded respondents costs "on a substantial indemnity basis in the amount of $97,034.68, inclusive of disbursements and taxes."  In so doing, Justice Koehnen stated, "[T]he degree of nondisclosure and the degree of disparity between the affidavits [appellants] submitted and the facts as I found them was of such magnitude and frequency that an award of substantial indemnity costs is appropriate and necessary to uphold the integrity of the *ex parte* process."  Appellants unsuccessfully moved for leave to appeal.  On March 13, 2018, Justice Koehnen was appointed as the case management judge.

In the meantime, respondents counterclaimed against appellants alleging they had interfered with the distribution of the documentary by improperly obtaining the injunction.  In February 2019, respondents indicated they planned to move to dismiss the action under Ontario's anti-SLAPP (Strategic Litigation Against Public Participation) law.  Justice Koehnen suggested the parties instead agree to "a speedy case timetable that would get the matter to trial quickly."  Respondents agreed to forgo their motion and, with the parties' agreement, Justice Koehnen set a schedule for the completion of discovery and exchange of affidavit evidence—which would constitute the parties' evidence in chief at trial—to allow the trial to be heard in the fall of 2019.

---

[4]    The court also was unpersuaded that appellants " 'should be granted an injunction on the traditional three part test which requires them to demonstrate a serious issue to be tried, that they will suffer irreparable harm if an injunction is not granted and that the balance of convenience favours granting an injunction.' "

Appellants changed attorneys several times during 2018 and 2019. There were periods where appellants appeared to be unrepresented. Justice Koehnen heard three different motions by three sets of counsel to withdraw from representing appellants in the Canadian action. In April 2019, Justice Koehnen granted the motion of appellants' second set of attorneys to be relieved as counsel, primarily for nonpayment of fees. Although appellants had several months' notice of their second counsel's intent to withdraw, they took no steps to appoint new counsel. Not until Justice Koehnen refused to grant their request "for lengthy extensions to the case timetable" did appellants retain new counsel. In May 2019, Justice Koehnen set a new case timetable with appellants' third counsel and respondents. Evidentiary matters were to be completed by the end of November.

In early June 2019, Justice Koehnen set a trial date for January 6, 2020. In early fall, appellants' third counsel advised the court "they would need to remove themselves from the record." Justice Koehnen "urged" Wiseau to retain new counsel immediately. At an October 4, 2019 case conference, Justice Koehnen told Wiseau the matter would proceed to trial on January 6, 2020, despite any change in appellants' lawyers. Justice Koehnen also advised Wiseau that his new lawyers likely would demand "a very large retainer" due to the volume of work they would face and the history of the action. In mid-October, appellants retained their fourth counsel. The parties already had exchanged their evidence as scheduled in the summer and fall of 2019.

About a month later, in mid-November 2019, appellants' fourth counsel moved to withdraw. According to Justice

Koehnen, appellants' second, third, and fourth counsel all had moved to withdraw on the ground appellants refused to provide a "realistic financial retainer" and "refuse[d] to pay for services" unless appellants had pre-approved "the specific task" charged. Justice Koehnen reasoned it was "simply not possible for counsel to prepare for trial on that basis." Appellants' fourth counsel had asked for a $25,000 retainer, but appellants objected. During a November 26, 2019 conference call to schedule the motion, Justice Koehnen advised Wiseau that, in his view, a $25,000 retainer was "very low"—considering the imminent 10-day trial —for a client outside the jurisdiction with whom counsel had no prior relationship. Justice Koehnen reiterated to Wiseau that "under no circumstances" would the January 6, 2020 trial date be postponed.

The court granted counsel's motion to withdraw on December 2, 2019 noting that, although relationships between client and counsel can break down through no fault of either, here, "the fault clearly lies with the [appellants]." The court continued, "The defendants are entitled to have the matter adjudicated. The plaintiffs should not be permitted to delay adjudication any further." Justice Koehnen expressly stated his "concern" that appellants again would use their lack of counsel as an excuse "to amend the case timetable . . . at the opening of trial." He admonished appellants that they would "have to seek an[d] appoint counsel who are available for a ten day trial to commence on January 6, 2020."

At a December 10, 2019 case management conference, appellants sought to retain their fifth counsel, but respondents

objected that the lawyer had an imputed conflict of interest.[5] Appellants also asked the court to adjourn the January 6, 2020 trial "to permit them to pursue with the Crown Attorney, allegations of perjury against [respondents]." Justice Koehnen denied the motion noting appellants gave no reason for failing to pursue allegations of perjury in the past or why the civil trial should not proceed. Wiseau also—for the first time—objected to the form of trial. The trial had been set to proceed with "examinations in chief being replaced by affidavits and with witnesses proceeding immediately to cross-examination." Appellants' former counsel had agreed to the procedure and timetable. The court overruled Wiseau's objection.

On December 30, 2019, appellants again moved to adjourn the trial on the ground they did not have counsel. On December 31, 2019, appellants' new counsel Daniel Brinza— the sixth lawyer to appear for appellants—appeared in a limited capacity to seek adjournment of the January 6, 2020 trial. Brinza had told appellants he could not adequately prepare for a trial beginning in a week, due to the large volume of documents.

In a four-plus page written ruling, Justice Koehnen denied the adjournment request. As stated in the decision, under Canadian law, in considering a request for adjournment, the court "must balance the interests of the plaintiff, the interests of the defendant and the interests of the administration of justice in the orderly processing of civil trials on their merits." Justice Koehnen expressly stated appellants had "a legitimate interest

---

[5]    Appellants' proposed new lawyer and respondents' attorneys had worked at the same firm while respondents' attorneys were representing them in the Canadian matter.

in having access to counsel and in being represented by counsel at trial"; the refusal to grant an adjournment could jeopardize that right; and whether it was appropriate to jeopardize that right depended "on the circumstances of the individual case." The Justice concluded that in this case, however, "any limitation on the plaintiffs' access to counsel is a limitation of their own making about which they have been warned on numerous occasions in the past."

The decision set forth the history of the setting of the expedited schedule and the repeated withdrawals of appellants' counsel from the case due to appellants' refusal to pay a reasonable retainer and to allow counsel to work on "any single task" without advance approval. Justice Koehnen explained he had told Wiseau "no lawyer would represent him on the trial unless he provided the lawyer with a retainer that covered the cost to prepare for and attend a 10-day trial, plus a generous contingency in the event their time estimates were incorrect." He also repeatedly had warned Wiseau the trial would proceed on January 6 and would not be adjourned. Justice Koehnen concluded appellants' request to continue the trial did "not fall into the category of unforeseen events": appellants had known since early June 2019 that the trial would begin on January 6, 2020, and had "treated their own lawyers in a commercially unreasonable manner and forced them to remove themselves from the record."

The court continued, "If the court permits [appellants] to act irresponsibly with respect to numerous sets of lawyers and then allows [appellants] to delay the trial because of their own lack of responsibility, it would be doing a grave injustice to the [respondents]." The court noted respondents had agreed to forgo

11

filing their anti-SLAPP motion—as "a concession" to appellants—based on the agreed-upon expedited trial schedule. They also had arranged to have a large number of witnesses—many from out of town—attend the trial in Toronto during the weeks of January 6 and 13, 2020. The court reasoned that, to adjourn a 10-day trial that had been set since June 2019 would amount "to a waste of 10 days of judicial time that could have been available for other litigants, but no longer is. [¶] While the [appellants] have a right to counsel, that right should not be used to deny other litigants waiting for court dates access to justice. [¶] To use Mr. Wiseau's language[,] it would be a 'major disservice to justice' to allow him to delay access to justice to [respondents] and others in the litigation system simply because he refuses to deal with lawyers on ordinary commercial terms."

On January 3, 2020, Justice Koehnen heard appellants' January 1, 2020 motion—brought by Brinza—to discontinue their claim. The court again balanced the prejudice appellants would suffer if not permitted to discontinue against the prejudice to respondents if leave to discontinue were granted. Brinza suggested the main action be discontinued, but respondents could continue with their counterclaim. Justice Koehnen noted a discontinuance of the main case would not lift the restraints imposed against respondents. Rather, appellants "simply propos[ed] to bring a new action in another jurisdiction for the same relief." Discontinuing appellants' action would deprive respondents—who already had waited two years—of an adjudication of the issues and "would force them to wait another undetermined period of time until [appellants'] new action is resolved." The court found the prejudice to respondents

"far outweigh[ed]" the prejudice to appellants and dismissed the motion for leave to discontinue the case.

On January 6, 2020, the trial proceeded over eight days before Justice Schabas. On April 23, 2020, Justice Schabas entered a money judgment in favor of respondents. The court issued a detailed and lengthy "Reasons for Judgment"—akin to a statement of decision—including background information, a summary of the evidence presented, legal analysis of appellants' causes of action and respondents' counterclaim, findings of fact, and conclusions of law. Appellants unsuccessfully sought reconsideration of the judgment and then unsuccessfully appealed the decision to the Court of Appeal for Ontario and to the Supreme Court of Canada.

The Canadian judgment totaled $1,089,010.16 in United States currency plus interest. Of that amount, $550,000 was for compensatory damages; and $481,521.80 was for costs, including $406,456.85 in attorney fees—$278,567.54 of which was "assessed on a 'substantial' indemnity basis," and $81,128.79 of which "was assessed on a 'partial' indemnity basis." The court also awarded respondents $200,000 in Canadian currency in punitive damages. The judgment became final on April 14, 2022, after the Supreme Court of Canada dismissed appellants' application for leave to appeal from the judgment of the Court of Appeal for Ontario.

On December 6, 2021, respondents commenced this action in the Los Angeles Superior Court by filing a petition to enforce the Canadian judgment under the Act. The parties stipulated to try the case through written briefing with no in-person testimony and based on a stipulated record from the Canadian court's record. The parties deemed their trial briefs as opening

statements and filed closing arguments.  Appellants asserted several defenses to the enforcement of the Canadian judgment.

On August 1, 2023, the trial court took the matter under submission.  The court issued its final statement of decision on October 19, 2023.[6]  The court rejected appellants' defenses, found the Act applied, and granted respondents' petition to recognize the Canadian judgment.  On November 6, 2023, the trial court entered judgment for respondents in the amount of $1,089,010.16 in United States currency plus prejudgment and postjudgment interest and costs.

## DISCUSSION

Appellants' appeal is limited to the trial court's rejection of two of their defenses to the enforcement of the Canadian judgment:  that the judgment was a fine or penalty, and that the proceedings were not compatible with due process.

## 1.    *Applicable law and standards of review*

Under the Act, California courts must recognize foreign-country judgments for the recovery of a sum of money that are "final, conclusive, and enforceable."  (§§ 1715, subd. (a), 1716, subd. (a).)  As relevant here, the Act does not apply to a foreign-country money judgment "to the extent that the judgment is . . . [¶] . . . [a] fine or other penalty."  (§ 1715, subd. (b)(2).)  The party seeking to enforce a foreign judgment has the burden to show the judgment "is entitled to recognition" under the Act.  (§ 1715, subd. (c).)  Once that burden is met, the party resisting recognition of the judgment "has the burden of establishing

---

[6]    The court issued its proposed statement of decision on October 2, 2023.  Appellants filed objections and respondents replied.

14

that a ground for nonrecognition stated in [section 1716,] subdivision (b), (c), or (d) exists." (§ 1716, subd. (e).)

An express ground for nonrecognition is where "[t]he specific proceeding in the foreign court leading to the judgment was not compatible with the requirements of due process of law." (§ 1716, subd. (c)(1)(G).) "[T]he focus of the inquiry 'is not whether the procedure in the rendering country is similar to U.S. procedure, but rather on the basic fairness of the foreign-country procedure.'" (Cal. Law Revision Com. com. (2017 Amend.), West's Ann. Code Civ. Proc. (2018 ed.) foll. § 1716.) A court may nonetheless recognize the judgment "if the party seeking recognition of the judgment demonstrates good reason to recognize the judgment that outweighs the ground for nonrecognition." (§ 1716, subd. (c)(2).) Accordingly, subparagraph (c)(1)(G) is a "discretionary ground[ ] for denying recognition." (Cal. Law Revision Com. com., *supra*, Background from the 2005 Uniform Act ¶¶ 3–4, 12.)

We review the question of whether the Canadian judgment is a "fine or penalty" under the Act—a question of law—de novo. (See, e.g., *Hyundai Securities Co., Ltd. v. Lee* (2013) 215 Cal.App.4th 682, 688 (*Hyundai Securities I*) ["Questions of law regarding the application and requirements of the Act are reviewed de novo."].) As the incompatibility of the foreign proceedings with the requirements of due process is a discretionary ground for nonrecognition, respondents assert the standard of review is for abuse of discretion. The authority respondents cite concerned a different ground for nonrecognition, however—where the judgment is repugnant to the public policy of the state or the United States. (Citing *Hyundai Securities Co., Ltd. v. Lee* (2015) 232 Cal.App.4th 1379, 1386 (*Hyundai*

15

*Securities II*).) Nevertheless, we agree that, because a court may recognize a foreign judgment on a proper showing by the party seeking to enforce it—even where the proceedings were not compatible with the requirements of due process—its decision to do so is reviewed for abuse of discretion.

" ' "An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice." ' " (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.) Accordingly, whether the court applied the correct legal standard in exercising its discretion is a question of law subject to de novo review. (E.g., *Esparza v. Safeway, Inc.* (2019) 36 Cal.App.5th 42, 59; see also *Camacho v. Superior Court* (2023) 15 Cal.5th 354, 383 [under abuse of discretion standard findings of fact are reviewed for substantial evidence and conclusions of law de novo].) We will reverse the trial court's application of the law to the facts, however, " 'only if arbitrary and capricious.' " (*Camacho*, at p. 383.)

2.    ***The portion of the judgment respondents ask the court to recognize is not a penalty***

The Act does not apply to a foreign-country money judgment "to the extent that the judgment is . . . [a] fine or other penalty." (§ 1715, subd. (b)(2).) Generally, the test for whether a judgment is a fine or penalty under the Act "is determined by whether its purpose is remedial in nature, with its benefits accruing to private individuals, or it is penal in nature, punishing an offense against public justice." (*Hyundai Securities II, supra*, 232 Cal.App.4th at p. 1388; see *id.* at pp. 1383, 1387 [foreign judgment for indemnification of criminal fine paid by the plaintiff was not a penalty or fine because it was meant to compensate the

16

plaintiff for damages it incurred in having had to pay that fine]; see also *Java Oil Ltd. v. Sullivan* (2008) 168 Cal.App.4th 1178, 1188 (*Java Oil*) [" 'A penal judgment . . . is a judgment in favor of a foreign state or one of its subdivisions, and primarily punitive rather than compensatory in character.' "].)

Although " '[s]ome states consider judgments penal for purpose of nonrecognition if multiple, punitive, or exemplary damages are awarded, even when no governmental agency is a party . . .[,] [i]n the United States, such judgments are not considered penal for this purpose.' " (*Java Oil, supra,* 168 Cal.App.4th at pp. 1188–1189 [holding foreign-country judgment ordering appellant to pay attorney fees was not a penalty because it did not punish appellant for an offense against the public but ordered him to compensate respondents for fees they incurred in defending the lawsuit].) Thus, in determining whether a judgment is a fine or penalty, courts consider such factors as "whether the judgment is for punishment rather than compensation; the judgment is payable to the state as opposed to a private party; the judgment arose from the penal laws of the country rather than a civil action; the damages were designed to make the defendant an example or punish the defendant; and a mandatory fine, sanction or multiplier was imposed on the defendant." (*Hyundai Securities II*, *supra*, 232 Cal.App.4th at p. 1389 [describing the factors suggested by the court in *Java Oil,* at pp. 1186–1189].)

a. *The $550,000 compensatory damages award compensated respondents for their lost revenue*

Respondents met their burden to demonstrate the Canadian judgment was not a penalty or fine under the Act. The $550,000 compensatory damages awarded to Room Full

of Spoons, Inc.[7] was a damages award between private, civil litigants to compensate Room Full of Spoons, Inc. for the revenue it lost as a result of its "inability to exploit *Room Full of Spoons*" due to the injunction that the Canadian court found Wiseau wrongfully had obtained.

Respondents' expert witness Doug Bania opined on the revenue respondents lost due to their inability to release their documentary around the release of *The Disaster Artist*. As part of his analysis, Bania considered three comparable situations where documentaries had been made about feature films. Bania opined that, "[d]ue to the success of *The Disaster Artist*,"[8] if respondents had been able to release *Room Full of Spoons* in 2017 before *The Disaster Artist's* release, Room Full of Spoons, Inc. conservatively would have earned $660,000 [in United States currency] from its production of the documentary. Bania noted *The Room* "benefitted considerably from the release of *The Disaster Artist*, especially following its release in December 2017." *Room Full of Spoons* did not receive any online " 'buzz,' " explained by the fact the injunction had forced respondents "to take down their social media promoting" the documentary. Bania also testified on cross-examination about "the 'cloud

---

[7]   The Canadian court concluded the damages should be awarded to respondents' corporate entity because it owns the documentary.

[8]   James Franco won a Golden Globe award for best actor in a musical or comedy for his work in *The Disaster Artist*, and the film was nominated for an Academy Award for Best Adapted Screenplay. It "garnered box office revenue of approximately $30 [million]."

18

on title' from this action and confirmed that this would explain why the documentary has still not been released."

In determining the amount of compensatory damages to award, the Canadian trial court considered several factors, including the timing of the injunction, the potential distribution deal with Gravitas, and the future earning potential of the documentary. The court found "compelling" and "accepted" Bania's "uncontradicted" evidence and conclusion that Room Full of Spoons Inc. would have earned $660,000 in United States currency had the documentary been released in 2017. The court considered that, although the injunction was lifted in November 2017, and *The Disaster Artist* was released commercially in December 2017, "[t]he injunction, which launched this lawsuit, had the effect of blocking the release of the documentary in 2017. Although lifted in November, [respondents] could not complete the distribution deal while the lawsuit was outstanding and, in any event, it would have been impossible to finalize, market and distribute *Room Full of Spoons* widely within just a few weeks in late 2017, which is when the 'buzz' for *The Disaster Artist* peaked." The court noted, however, that interest in *The Room* continued and there would "be a market for *Room Full of Spoons* when it is finally released." For that reason, the court was "willing to assume that, absent 'buzz' from *The Disaster Artist, Room Full of Spoons* [would] likely earn something similar to" a documentary "at the low end of Bania's comparables, or about US$110,000." The court thus reduced the compensatory damages award by that amount to $550,000.

Nevertheless, appellants argue the $550,000 compensatory damages award "was an over-inflated and cleverly disguised penalty." They argue the $550,000 compensatory damages award

19

was penal in nature because it "went beyond what was necessary to compensate [r]espondents." (Citing *Miller v. Municipal Court of Los Angeles* (1943) 22 Cal.2d 818, 837 for the proposition that "a 'penalty' includes any law compelling a defendant to pay a plaintiff other than what is necessary to compensate him for a legal damage done him by the former.")[9]  Appellants seem to argue respondents were not damaged by the injunction, but by appellants' filing of the lawsuit itself.  They note the Canadian court and respondents "repeatedly stated" the lawsuit, not the injunction, prevented the release of *Room of Spoons*. Appellants also assert the Canadian court awarded respondents $97,034.68 "as a penalty against [a]ppellants" after dissolving the injunction.[10]  Appellants also surmise the Canadian court awarded respondents "an additional $1.2+ million under the pretext that the injunction was wrongful and prevented (the already released film) from being released at a 'commercially critical time.'"  Appellants' contentions are without merit.

In respondents' words, the injunction was "devastating." After considering the evidence, the Canadian trial court apparently agreed.  The court specifically found it was the injunction that prevented respondents from capitalizing on

---

[9]    The court in *Miller* reviewed statutes requiring payment of treble damages, double damages, and minimum fines and found they were penal for purposes of enforcement of foreign state judgments.  (*Miller v. Municipal Court of Los Angeles, supra*, 22 Cal.2d at p. 837.)

[10]    The $97,034.68 award was not included in the judgment. It related to respondents' attorney fees and costs—reduced from their requested $106,413.68—incurred in opposing the injunction motion.

the " 'buzz' " of *The Disaster Artist*—that despite the lifting of the injunction before that film debuted, "it would have been impossible to finalize, market and distribute" the documentary within just a few weeks in late 2017. The injunction had prevented respondents from marketing *Room Full of Spoons* or referring to Wiseau or *The Room*—the subjects of the documentary—and had required them to remove pre-injunction, historical posts, as well. Moreover, the trial court reduced respondents' estimated damages, recognizing *Room Full of Spoons* still could be released and earn revenue. Accordingly, we conclude the Canadian court did not award the $550,000 to make an example of—or to punish—appellants, but to compensate respondents for damages caused by the wrongful injunction.

Appellants contend the Canadian court ignored their evidence that respondents had no contract with Gravitas and Gravitas had no plans to release the documentary theatrically, as well as evidence that the documentary "required additional editing and would have had challenges obtaining insurance." They thus argue the court "sided with [r]espondents and punished [a]ppellants for enforcing their rights through the Courts." Appellants' argument relates to their disagreement with the Canadian court's assessment of the evidence, findings, and analysis of respondents' damages. It has no bearing on whether the compensatory award constitutes a penalty under the Act. Even if the Canadian court got it wrong, the judgment is final. Appellants had their chance to appeal and they lost. Appellants' argument that the Canadian court awarded respondents $1.2 million (in compensatory damages and costs and fees) "under the *pretext* that the injunction was wrongful"

21

and prevented the documentary "from being released at a 'commercially critical time,'" is purely speculative. (Italics added.) As none of the factors leads us to conclude the $550,000 compensatory damages award was a penalty or fine, we reject appellants' contention that the Act does not apply.

  b.    *Respondents did not cause the injunction to be extended*

Appellants also argue the compensatory damages award was inflated because it included the four-and-a-half-month period between the original return date for the hearing on appellants' motion for an interlocutory injunction in June 2017, and the continued October 2017 date that respondents had requested. Appellants argue the four-and-a-half-month period never should have been included in Bania's calculation of damages because respondents asked for the injunction hearing to be continued thus extending the injunction.

On June 14, 2017, appellants brought an ex parte motion for an interim and interlocutory injunction preventing respondents from releasing, distributing, or promoting their documentary. Because the court granted the motion ex parte, the court "adjourned" the motion for a 30-minute hearing on June 23, 2017, for the court to determine "whether to further extend the terms of the injunction order, and if so for how long and upon what, if any, additional terms." Accordingly, as respondents argue, the interim injunction would not simply have expired on June 23, 2017.

Respondents appeared at the June 23, 2017 hearing and asked the court to adjourn the motion to give them time to retain counsel and present evidence in opposition to the continuation of the injunction. We can infer respondents would have been

unable to defeat the extension of the injunction on June 23. Thus, if respondents had not asked for the adjournment, the injunction would have remained in effect until trial—another two and half years. Accordingly, respondents' request to continue the hearing did not extend the time the injunction was in place but enabled respondents to obtain its dissolution much earlier. Moreover, the court selected October 10, 2017, for the new hearing because it was "the first available date."

        c.     *The award of punitive damages does not render the rest of the judgment a penalty*

The Canadian court also awarded respondents $200,000 in Canadian currency in punitive damages. Respondents agree the punitive damages award was a penalty that should not be recognized under the Act. They did not include the $200,000 in Canadian currency in their petition/complaint for recognition of the Canadian judgment, however. Without citation to authority, appellants nevertheless argue "[r]espondent[s'] exclusion of the punitive damages component of the judgment demonstrates the entire judgment can't be recognized because the basis of the compensatory damages award was penal in nature."

Section 1715, subdivision (b)(2) expressly states that the Act "does not apply to a foreign-country judgment . . . *to the extent* that the judgment is . . . [a] fine or other penalty." (Italics added.) As respondents argue, the plain meaning of the qualifying language—"to the extent that"—demonstrates it is only the portion of a judgment that is a fine or penalty that cannot be recognized, not that the entirety of a money judgment should not be recognized if any part of it is a fine or penalty. (See *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [if the plain language of a statute

23

is clear "courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend"].)

> d. *The $278,567.54 in costs awarded on a substantial indemnity basis was not a penalty under the Act*

Finally, appellants argue the $278,567.54 in costs awarded on a substantial indemnity basis "were penal in character" based on the Canadian court's statements in its "Reasons for Costs." According to the Canadian authorities appellants gave the trial court, a Canadian court may determine in its discretion to whom and what costs shall be paid. (*Skourtis v. The City of Toronto et al.* (June 22, 2021 CV-18-590158) 2021 ONSC 4492 (CanLII).) "The overriding principles in determining costs are fairness and reasonableness." (*Ibid.*) "The court should only depart from the general rule that costs on a partial indemnity scale should follow the event for very good reasons such as misconduct of the party, miscarriage in procedure or oppressive or vexatious conduct." (*Ibid.*; *Covenoho v. HomeLife/Response Realty Inc., et al.* (Jan. 1, 2023, DC 008/22) 2023 ONSC 168 (CanLII) ["substantial indemnity costs should not be awarded except in rare and exceptional circumstances"].)

In the Canadian trial court's June 24, 2020 Reasons for Costs, the court explained, "In deciding costs, my role is to consider whether, aside from the injunction motion, the conduct of the case by Mr. Wiseau and his counsel was so egregious and reprehensible that it merits an elevated award of costs." The court found Wiseau's conduct, accusations against the court, and "isolated allegation of perjury" alone did not support awarding substantial indemnity costs. The court noted, however, that respondents had served offers to settle the main action

24

and the counterclaim a month before trial began, and they had obtained both a monetary judgment on the counterclaim and a costs award on the main action that were higher than the settlement offers. Under the Canadian Rules of Civil Procedure, the court has discretion to award substantial indemnity costs from the date of an offer to settle a counterclaim or the main action. (R.R.O. 1990, Reg. 194, r. 49.10, 49.13, 49.14).) Rule 57 of the Canadian Rules discusses various factors "the court may consider, in addition to the result in the proceeding and any offer to settle" in exercising its discretion to award costs. (*Id.*, r. 57.01(1).)

Justice Schabas explained that he had noted many factors "favour[ed], but on their own did not persuade" him, "that costs on an elevated basis should be awarded." The court found the offers to settle "tip[ped] the balance, however, in favour of elevated costs at least from the date that those offers were made." Justice Schabas reasoned respondents "achieved far better results than were contained in their settlement offers, and in my view, [respondents] should be awarded substantial indemnity costs from December 3, 2019 forward." Of the $629,313.57 respondents sought in their Bill of Costs, the court awarded "the costs under the headings 'Pre-Trial Hearing After Rule 49 Offer,' 'Trial Preparation (2019/2020),' 'Trial' and 'Costs Submissions' on a substantial indemnity basis," totaling $278,567.54.

Contrary to appellants' representations, the Canadian court thus did not award substantial indemnity costs to punish or make an example of appellants. The court specifically found Wiseau's conduct did not justify imposition of elevated costs. Rather, the court awarded substantial indemnity costs in its

25

discretion under Rules of Civil Procedure, rule 49 based on respondents' achievement of "far better results" than what were contained in their rejected settlement offers.

We conclude the Canadian court's discretionary award of substantial indemnity costs was not a fine or penalty under the Act. True, as appellants assert, the Canadian court explained that " 'costs serve a purpose beyond indemnification' including encouraging settlement, deterring frivolous actions and preventing abuse of the court's process." That litigants may have to reimburse their opponents' costs—including attorney fees—if they lose does not render the award of costs a penalty or fine under the Act. The Canadian court did not award the costs under a penal statute designed to punish a public offense. Nor were the costs paid to the court or state. The award of substantial indemnity costs, in short, " 'afford[ed] a private remedy to a person injured by [a] wrongful act.' " (*Java Oil, supra*, 168 Cal.App.4th at p. 1187.)

*Java Oil* is on point. There, the court found an award of attorney fees in a malicious prosecution lawsuit was not a penalty under the Act. (*Java Oil, supra*, 168 Cal.App.4th at pp. 1188–1189.) Although the defendant "view[ed] the attorney fee award as a penalty for groundless litigation, it was not a penalty within the meaning of the [Act]." (*Id.* at p. 1189.) The judgment arose from a civil action, not from an enforcement of the foreign country's penal laws; the defendant was not being punished for a public offense but ordered to compensate the plaintiff for having to defend the frivolous action; and the court imposed "[n]o mandatory fine, sanction, or multiplier." (*Id.* at pp. 1188–1189.)

26

Similarly, here, the Canadian court's substantial indemnity cost award compensated respondents for their costs and attorney fees at trial.[11]  Even if effectively punishing appellants, the purpose of the award was reparation to respondents, not punishment of appellants "for an offense against the public." (*Java Oil*, *supra*, 168 Cal.App.4th at p. 1188; see also *Erbe Elektromedizin GMBH v. Canady* (W.D.Pa. 2008) 545 F.Supp.2d 491, 496–497, cited by *Java Oil* [attorney fees awarded to prevailing party after party incurred costs defending civil patent suit were meant to compensate party, not punish losing party for a penal offense and therefore qualified as enforceable foreign judgment]; *Loucks v. Standard Oil Co. of New York* (N.Y.Ct.App. 1918) 120 N.E. 198, 198–199, cited by *Java Oil* [award of damages to estate in wrongful death case under statute allowing minimum recovery not penal under the Act where offender was punished as "reparation to those aggrieved by his offense"].)  Nor did the Canadian court impose a multiplier or other mandatory fine or penalty in awarding the costs.  Rather, the court in its discretion imposed substantial

---

[11]    Respondents' attorneys apparently took the case pro bono. The Canadian court rejected appellants' argument that "a large costs award would amount to a windfall for the lawyers akin to a contingency fee."  The court explained Canadian law permitted awards of costs to pro bono counsel and self-represented litigants and law firms.  Such awards ensured both pro bono and non-pro bono parties understood they were not free to abuse the system without fear of having to pay costs; and promoted access to justice by enabling and encouraging lawyers to volunteer to work pro bono on deserving cases.  (Citing *1465778 Ontario Inc. et al. v. 1122077 Ontario Ltd. et al.* (2006), 2006 CanLII 35819 (ON CA), 82 O.R. (3d) 757, at paras. 30, 35.)

indemnity costs—as permitted under Canadian rules—to compensate respondents for their costs of trial given the trial could have been avoided had appellants settled the case.

3. ***The court did not err in finding the denial of the continuance was not inconsistent with due process***

Appellants contend the Canadian judgment also should not be recognized because the proceedings resulting in the judgment were incompatible with due process. (§ 1716, subd. (c)(1)(G).) The due process exception under subdivision (c)(1)(G) is "reserved for challenges as to the 'integrity or fundamental fairness with regard to the particular proceeding leading to the foreign-country judgment.' " (*AO Alfa-Bank v. Yakovlev* (2018) 21 Cal.App.5th 189, 215.) " '[F]oreign courts are not required to adopt "every jot and tittle of American due process," ' " however. (*Ibid.*) Thus, the court's "task is to decide whether the foreign procedures are ' "fundamentally fair" ' and do not offend ' "basic fairness." ' " (*Id.* at p. 216 ["the question is whether the foreign proceeding conformed to . . . the 'international concept of due process' "].)

Appellants contend the Canadian court proceedings were fundamentally unfair because the court effectively denied them their right to counsel when it would not continue the trial date after allowing appellants' attorneys to withdraw. Appellants note, "[a] civil litigant has a constitutional right to be represented by counsel at trial." (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1398 (*Oliveros*).) More accurately, "a party has the right to appear through counsel if a lawyer has been retained," but there " 'is no due process right to counsel in civil cases.' " (*In re Marriage of Tara & Robert D.* (2024) 99 Cal.App.5th 871, 887 (*Tara*), quoting *Walker v. State Bar* (1989) 49 Cal.3d 1107, 1116.) Here, appellants in fact were represented

28

by counsel at the trial leading to the Canadian judgment. Appellants argue, however, they were "effectively *pro se*" due to their newly retained counsel Daniel Brinza having had only one week to prepare for trial.

"A motion for continuance is addressed to the sound discretion of the trial court. [Citation.] However, ' "[t]he trial judge must exercise his discretion with due regard to all interests involved, and the refusal of a continuance which has the practical effect of denying the applicant a fair hearing is reversible error." ' " (*Oliveros*, *supra*, 120 Cal.App.4th at p. 1395.) We conclude the Canadian court's refusal to continue the trial did not render the proceedings fundamentally unfair to appellants.

In the trial court, appellants argued the Canadian court abused its discretion in denying their request to adjourn (continue) the January 6, 2020 trial date, relying on *Oliveros* and *Vann v. Shilleh* (1975) 54 Cal.App.3d 192 (*Vann*). On appeal, appellants also rely on *Tara, supra*, decided during the pendency of this appeal. The trial court found *Oliveros* and *Vann* distinguishable. We agree and also find *Tara* distinguishable.

In *Oliveros*, the defendant county's outside trial counsel learned of an unexpected, last-minute scheduling conflict with a trial in an earlier-filed action and asked the trial court to continue the trial against the county. (*Oliveros, supra*, 120 Cal.App.4th at pp. 1392–1394.) The court—believing defense counsel had taken on too many cases and should get another lawyer in his firm to handle the case—would not continue the trial to begin after the earlier-filed case concluded. The court began the trial without the presence of the county or its counsel and directed a verdict in plaintiffs' favor for more than $12.5 million. (*Id*. at pp. 1393–1394.) The appellate court concluded

29

the trial court abused its discretion because it failed to "carefully balance all of the competing interests at stake" before denying the continuance.  (*Id.* at p. 1399.)  The court noted that, " ' "[w]hile it is true that a trial judge must have control of the courtroom and its calendar and must have discretion to deny a request for a continuance when there is no good cause for granting one, it is equally true that, absent [a lack of diligence or other abusive] circumstances which are not present in this case, a request for a continuance supported by a showing of good cause usually ought to be granted." ' "  (*Id.* at p. 1396.)

Similarly, in *Vann*—based on the trial court's "policy of no continuance[s]"—the court denied a defendant's motion to continue a trial after his attorney unexpectedly withdrew one court day before trial.  (*Vann, supra*, 54 Cal.App.3d at pp. 195– 196.)  The bench trial proceeded with that defendant acting as his own attorney.  (*Id.* at p. 196.)  The Court of Appeal concluded the trial court failed to exercise its discretion by denying the continuance solely based on its policy against continuances. (*Id.* at pp. 198–199.)

The court noted, however, that "[i]t cannot be held that litigants in all cases may demand a continuance by engaging counsel just prior to a trial date, where there is no showing of any necessity for any change of counsel, but a necessary substitution of counsel just prior to trial may justify the granting of a continuance, in *some cases*."  (*Vann, supra*, 54 Cal.App.3d at p. 196, italics added.)  The court concluded the attorney's withdrawal on the eve of trial—because the defendant rejected a settlement—was unethical, and it was the trial court's duty to see that the attorney's former client "was protected, so far as possible, from the consequences of [the attorney's] improper

abandonment of his client." (*Id.* at p. 197.) The court noted that, when an attorney withdraws on the eve of trial, "the party ordinarily does not have sufficient time to procure counsel, and *unless the party actually had sufficient advance warning that his attorney intended to withdraw*, the circumstances justified granting a continuance." (*Ibid.*, italics added.)

In *Tara*, a week before trial, appellant's counsel moved to be relieved due to a breakdown in the attorney-client relationship. (*Tara, supra*, 99 Cal.App.5th at p. 875.) After a hearing, the court permitted the attorney to withdraw but would not continue the trial—except for a one-day postponement—noting it had " 'made . . . clear again and again that this trial was not going to be continued.' " (*Id.* at p. 876.) Although appellant "told the court he did not want to proceed without counsel and did not think he could successfully try the case on his own," the court declined to continue the trial further. (*Id.* at pp. 876–877.)

The appellate court found the trial court abused its discretion, but the court's error did not affect the outcome of the proceedings. (*Tara, supra*, 99 Cal.App.5th at pp. 883, 889.) The court explained that, in exercising its discretion, the trial court "could not merely rely on its prior statements, but was instead required to revisit the reasons [for] those statements to determine whether they still applied in light of the changed circumstance"—the withdrawal of counsel on the eve of trial. (*Id.* at pp. 881–882.) The court noted the trial court's decision there, unlike in *Vann*, was not based on a blanket policy against continuances in all cases, but "it was based on a blanket policy of denying any continuance of the trial in this case, despite a significant change of circumstance." (*Id.* at p. 882.) Accordingly,

31

as in *Vann*, the trial court had failed "to consider whether new facts and a developing situation" required reevaluation of its earlier decisions and a rebalancing of the competing interests. (*Ibid.*)  The court expressly did not hold, however, "that the trial court was obligated to grant a continuance, or that a continuance of some particular length was required." (*Ibid.*)  The problem there was the trial court "failed to conduct the necessary inquiry." (*Ibid.*)

Appellants argue the Canadian court, like the courts in *Oliveros* and *Vann* "hid behind the façade it needed to keep to its schedule no matter what without due regard to the extreme prejudice placed upon Appellants . . . [and] failed in its duty to protect Appellants from the consequences of Appellants' prior counsel's improper abandonment."  Appellants also contend the Canadian court, as the court did in *Tara*, applied a blanket policy of no continuances in this case and thus did not properly exercise its discretion in deciding whether to grant a continuance.  The record does not support appellants' contentions.

First, the withdrawal of appellants' counsel is different from the situations in *Oliveros, Vann,* and *Tara*.  There is no evidence appellants' attorneys acted unethically in withdrawing from representing them, as in *Vann*, or the need for a continuance lay at the attorneys' feet, as in *Oliveros*.  Moreover, in all three cases, the attorney moved to withdraw, or learned of the need for a continuance, only a week or days before the trial was to begin.  Here, appellants' *fourth* counsel stated they intended to withdraw from the case a month and a half before the trial date.  Appellants were not blindsided by their attorneys' withdrawal.  (Cf. *Vann, supra*, 54 Cal.App.3d at p. 197 [absent

32

sufficient warning of attorney's withdrawal, eve-of-trial withdrawal justifies granting a continuance].)

Indeed, the reason for counsel's withdrawal—and the withdrawal of appellants' second and third sets of attorneys— primarily was due to Wiseau's refusal to pay a reasonable retainer. Appellants' fourth counsel had requested a $25,000 retainer that appellants had deemed unreasonable. Yet, after appellants' third attorneys withdrew—before appellants had retained their fourth counsel—Justice Koehnen had told Wiseau that his new attorneys likely would want "a very large retainer given the volume of work . . . and the history of this action." Wiseau nevertheless refused to pay the $25,000 retainer, which Justice Koehnen had said was more than reasonable. As he noted in his ruling granting counsel's motion to withdraw, Justice Koehnen would have expected counsel to have demanded at least a $75,000 retainer under the circumstances.

Second, contrary to appellants' contention, the record demonstrates the Canadian court did not deny appellants a continuance merely to maintain its schedule or due to a pre-judged, blanket policy of no continuances for the case, as in *Tara* and *Vann*. Indeed, although appellants' second counsel—who withdrew for nonpayment of fees—had agreed to an expedited schedule with an anticipated trial date in early fall 2019, Justice Koehnen revised that timetable to accommodate appellants after they had delayed in retaining new counsel, ultimately setting the trial for January 6, 2020. Appellants' third counsel agreed the revised schedule was reasonable and did not object.

True, after setting the trial for January 6, 2020, Justice Koehnen repeatedly warned Wiseau the trial would not be

33

postponed if appellants changed counsel.  But we reasonably can infer those warnings were the direct result of appellants having created the issues leading to their need for new counsel, not an indication that Justice Koehnen *never* would entertain continuing the trial date if the circumstances warranted it.  Justice Koehnen noted appellants had "used their lack of counsel as an excuse in the past to amend the case timetable."  Reasonably, he had "a significant concern" appellants would "try to do so again."  Moreover, as the trial court noted, Justice Koehnen specifically acknowledged that "relationships between client and counsel can breakdown through no fault of either," sometimes requiring the court to make an accommodation.  Justice Koehnen found, however, that "[i]n this situation . . . the fault clearly lies with [appellants]," and would not permit appellants to delay any further respondents' right to have the matter adjudicated.

Critically, when appellants asked for a continuance the week before the trial date—because their new (and sixth) counsel could not adequately prepare for a trial beginning on January 6— Justice Koehnen engaged in the inquiry lacking in *Tara* and balanced the competing interests in accordance with Canadian law.  Justice Koehnen's four-plus-page written ruling makes clear the court considered the current circumstances and found they did not warrant delaying the trial.  The court expressly acknowledged appellants had "a legitimate interest" in having counsel represent them at trial.  The court explained "a refusal to adjourn should never be entirely absolute because there will always be the possibility of totally unforeseen circumstances."  After considering the history of the case—and appellants' refusal to pay counsel "anything approaching a reasonable retainer for

34

trial" or to allow counsel to work on tasks unless preapproved—the court found appellants' request did not "fall into the category of unforeseen circumstances."

Rather, the Canadian court found appellants had created "any limitation" on their access to counsel. The court explained,

> "[Appellants] have known since June 2019 that the trial would begin on January 6, 2020. They have treated their own lawyers in a commercially unreasonable manner and forced them to remove themselves from the record. [¶] . . . [T]hey have had ample time and opportunity to avail themselves of the right to counsel. They have failed to act responsibly in doing so. They should not be able to visit the consequences of their failure to act responsibly on the [respondents] or other participants in the justice system. [¶] . . . [¶] [I]t would be a 'major disservice to justice' to allow [Wiseau] to delay access to justice to [respondents] and others in the litigation system simply because he refuses to deal with lawyers on ordinary commercial terms."

Given this, we cannot conclude the Canadian court—or the trial court in assessing the Canadian court proceedings—acted arbitrarily or failed properly to exercise its discretion in denying appellants' request to continue the trial. The case management judge—who had been involved in the matter since dissolving the interim injunction in October 2017—found appellants had not been diligent in moving the matter forward and their sudden need for new counsel was a situation they easily

could have avoided.  (See *Oliveros, supra*, 120 Cal.App.4th at p. 1398 [implying court had discretion to deny a continuance where lack of diligence or other abusive circumstances exists].) The court reasonably balanced appellants' need to retain new counsel the week before trial—and the circumstances leading to their counsel's withdrawal—against the prejudice to respondents, who had agreed not to bring their anti-SLAPP motion if the case could be tried quickly.  (See *Tara, supra*, 99 Cal.App.5th at p. 882 [trial court not obligated to grant continuance based on withdrawal of attorney before trial but must rebalance competing interests based on new facts before denying continuance].)

As we have concluded the Canadian court properly acted within its discretion in denying appellants' request to postpone the trial, the trial court did not err in finding the Canadian proceedings were not inconsistent with the principles of due process.  As the trial court so aptly explained, "The mere fact that another court might have exercised its discretion differently and granted [appellants'] request for a continuance is not a denial of American due process—let alone the denial of the international concept of due process for purposes of refusing to recognize an otherwise valid foreign judgment."

Appellants nevertheless contend the "forced litigation" resulted in "a stream of prejudicial actions" that would not have occurred had their counsel had adequate time to prepare. Appellants articulate two ways in which they were prejudiced. They first contend that, had they "been properly represented," they could have excluded from the case "highly prejudicial" documents asserting a claim of fraud against Wiseau that a California superior court had sealed.  Respondents' counsel cross-examined Wiseau about and referred to the sealed

documents during the trial. But Wiseau and his trial attorney did act to exclude the documents—they objected and moved to expunge all references to the California action on the ground the record had been sealed. In a supporting affidavit, Wiseau averred he had known respondents had access to the California court record since February 2016 when he saw the documentary, however. He affirmed he had told Harper about the court order sealing the record and that "any publication of it would be a 'contempt of court.' " Wiseau's affidavit attached a copy of the California court order providing that the " 'entire record in this matter be sealed.' "

The Canadian trial court dismissed the motion, reasoning there was no evidence respondents "had improperly obtained or reproduced the court documents, or copies of them," which could "be obtained from many sources." The court also reasoned that, despite knowing for years that the documents had been used in the documentary, Wiseau had taken "no steps to enjoin the release of the film on that basis or any other steps to enforce any sealing order." Nor had he taken any earlier steps to object to their use in the lawsuit. On cross-examination, Harper also denied knowing the California case was sealed. In short, appellants have not shown a reasonable probability that the Canadian trial court would have excluded the documents had the trial been continued. Nor have appellants demonstrated how the sealed documents prejudicially affected the outcome—the Canadian trial court concluded the documents "were of little, if any, relevance or value." (See *Tara, supra*, 99 Cal.App.5th at pp. 883–884, citing Cal. Const., art. VI, § 13 [usually no reversal "where the challenged error did not affect the outcome of the proceedings and thus did not prejudice the appellant"]; see also,

37

e.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 840 ["In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of his or her motion for a continuance does not require reversal . . . ."].)

Second, appellants contend that, had their trial lawyer had more time to prepare, it was "more than likely that [a]ppellants would have been able to rebut the highly inflated compensatory damages award proffered by [r]espondents' expert." Appellants seem to contend that, had the Canadian court continued the trial, their lawyer would have been able to convince the court that Bania's damages calculation was inflated because it included the four-month period between the original June 23, 2017 return hearing on appellants' ex parte request for an injunction and the continued October 10, 2017 hearing date. Again, we find no error in the Canadian court's inclusion of that time period in assessing compensatory damages. Moreover, as the parties already had exchanged their direct evidence in the summer and fall of 2019 —leaving only cross-examination for trial—the basis for Bania's damages calculation hardly was a surprise. Indeed, Bania appears to have provided his 30-page expert affidavit (plus exhibits) setting forth the bases for his opinion around October 23, 2019—before appellants' fourth counsel withdrew.

Accordingly, even if the Canadian court had abused its discretion in denying the continuance, any error was harmless.[12] (*People v. Samayoa, supra*, 15 Cal.4th at p. 840; *Tara, supra*, 99 Cal.App.5th at pp. 883–884.)

---

[12] Nor, for the same reasons, did the inclusion of the above evidence render the Canadian trial fundamentally unfair, to the extent appellants separately contend the trial was unfair regardless of the court's denial of the continuance.

## DISPOSITION

We affirm the judgment and award costs on appeal to respondents.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, Acting P. J.

We concur:

ADAMS, J.

HANASONO, J.*

---

*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.